UNITED STATES of America,
Plaintiff,

v.

E.I. DU PONT DE NEMOURS
& CO., INC., Defendant.

No. 01–CV–658S.

United States District Court,
W.D. New York.

Aug. 31, 2004.

David L. Gordon, Katherine M. Kane, Scott D. Bauer, U.S. Department of Justice, Washington, DC, for Plaintiff.

Mary Pat Fleming, U.S. Attorney's Office, Buffalo, NY, for Plaintiff and Counter–Defendant.

Daniel M. Darragh, Buchanan Ingersoll PC, Pittsburgh, PA, for Defendant and Counter–Claimant.

**DECISION AND ORDER**

SKRETNY, District Judge.

## TABLE OF CONTENTS

| Title | Page |
|---|---|
| Introduction | 220 |
| Findings of Fact | 221 |
| I. Necco Park | 221 |
|    A. Generally | 221 |
|    B. Site Characteristics | 221 |
|    C. Nature and Extent of Contamination | 222 |
| II. History of EPA Activity at the Necco Park Site | 224 |
|    A. RCRA § 3013 Order and Related Consent Decree | 224 |
|    B. AOC and Related Work | 225 |
|    C. Risk Assessment | 225 |
|    D. ROD | 226 |
|    E. UAO | 227 |

III. CERCLA § 107 Cost–Recovery Litigation ...............................228
 A. Procedural History ............................................228
 B. Documentation of EPA Response Costs ..........................228
 C. Documentation of DOJ Enforcement Costs........................229
  i. Direct Labor Costs .......................................229
  ii. Other Direct Costs .......................................230
  iii. Indirect Costs ...........................................230
 D. Summary of Administrative Record ..............................230

**Conclusions of Law** ......................................................231
 I. Background ......................................................231
 II. Recovery of Costs Related to RCRA Order and Consent Decree .............233
  A. RCRA Order & Remedial Investigation ...........................233
  B. Use of RCRA Authority & *Per Se* Inconsistency with the NCP .........236
 III. Recovery of Costs Related to DOJ Enforcement Activities...................238
  A. Statutory Basis for Recovery of DOJ Enforcement Costs ...............238
  B. DOJ Enforcement Costs & the NCP ...............................241
   i. "Necessary" or "Reasonableness" Standard ......................241
   ii. Documentation of DOJ Enforcement Costs ......................243
 IV. Validity of September 1998 CERCLA § 106 Order .......................246
  A. Standard for Issuance of UAO under CERCLA § 106(a)...............246
  B. Defendant's Challenge to the September 1998 UAO ..................248
   i. Risk Assessment & Probability.................................248
   ii. Use of "Baseline" Risk Assessment ............................249
  C. Judicial Review of UAO .......................................249
 V. Recovery of Costs Related to September 1998 UAO .......................254
 VI. Declaratory Judgment and Prejudgment Interest .........................255

**Summary** ...............................................................255
**Orders** ................................................................256
**List of Acronyms** ......................................................256

## INTRODUCTION

This is a cost-recovery action brought under section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). Plaintiff seeks to recover costs incurred in connection with the investigation and cleanup of Necco Park, a hazardous waste site owned by Defendant E.I. du Pont de Nemours & Co., Inc. and located in Niagara Falls, New York.

A non-jury trial was held before this Court on April 26, 2004 and April 27, 2004. Plaintiff introduced numerous exhibits and offered the testimony of two witnesses, Thomas E. Taccone and William Kime.[1] Defendant did not call any witnesses, but introduced several exhibits. This Court heard closing statements from counsel on April 27, 2004, which included detailed presentations of the evidence contained in the Administrative Record. In addition, this Court frequently posed questions to counsel during the presentation of evidence and during closing arguments.

Rule 52 of the Federal Rules of Civil Procedure provides, in pertinent part, that "[i]n all actions tried upon the facts without a jury ... the court shall find the facts specially and state separately its conclusions of law thereon." FED. R. CIV. P. 52(a). In accordance with Rule 52, this Court's findings of fact and conclusions of law are set forth below.

---

1. Plaintiff's trial exhibits were submitted in thirty-eight separate binders, including the twenty-one volume Administrative Record.

## FINDINGS OF FACT

### I. Necco Park

#### A. Generally

1. Necco Park is a twenty-four acre landfill located in an industrialized section of the City of Niagara Falls, New York. (Plaintiff's Trial Exhibit 1, Vol. XVII, at p. 500009).[2]

2. The landfill is located approximately 1.5 miles north of the Niagara River. (Exhibit 1, Vol. XIII, at pp. 400031–33).

3. Residential neighborhoods are located approximately 2000 feet to the south and 2500 feet west of the landfill. (Exhibit 1, Vol. XIII, at p. 400032).

4. A wastewater treatment facility owned by CECOS International, Inc. (the "CECOS facility") and three inactive hazardous waste landfill cells are located immediately south of Necco Park. (Exhibit 1, Vol. XIII, at p. 400032; Exhibit 1, Vol. XVII, at p. 500009).

5. Defendant has owned Necco Park since approximately 1930. (Docket No. 52, at p. 1).[3]

6. Defendant began using the property as a landfill during the mid-to-late 1930s. (Docket No. 52, at p. 1).

7. By 1977, the company had disposed of approximately 93,000 tons of industrial waste at Necco Park. (Docket No. 52, at p. 1).

8. Some of the waste disposed of at the landfill included hazardous substances, such as hexachloroethane, carbon tetrachloride, chloroform, methylene chloride, and hexachlorobenzene. (Exhibit 1, Vol. XIII, at pp. 400033–34; Exhibit 1, Vol. XVII, at pp. 500015–16; Docket No. 52, at pp. 1–2).

9. In 1977, Defendant suspected that some of the industrial waste might be leaking from Necco Park into the surrounding soil and groundwater. In response, the company voluntarily stopped disposing of waste at the landfill and took various investigative and corrective actions. (Docket No. 52, at p. 2).

10. Between 1978 and 1982, Defendant placed a clay cap over the landfill, installed groundwater monitoring wells, collected and analyzed soil and groundwater samples, and installed and operated two groundwater pumping wells. Between 1983 and 1985, Defendant undertook additional studies to assess the nature and extent of groundwater contamination and to evaluate the effectiveness of its response measures. (Tr.,[4] at 96–97; Exhibit 1, Vol. V, at pp. 301802–807, 301812–814; Docket No. 52, at p. 2).

#### B. Site Characteristics

11. In this case, the designation "Necco Park Site" or "the Site" refers to the Necco Park landfill itself, as well as the surrounding areas where hazardous substances from the landfill have come to be located in the soils, bedrock, and groundwater. (Exhibit 1, Vol. XVII, at p. 500009).

12. The geology beneath the Necco Park Site consists of an overburden of

---

2. Plaintiff's trial exhibits have been identified by numbers. Letters have been used to designated Defendant's trial exhibits.

3. Citations to Docket No. 52 refer to a Decision and Order filed by this Court on September 29, 2003, which resolved the parties' respective summary judgment motions.

4. Citations to "Tr." refer to the Trial Transcript. Volume I of that transcript (pp. 1–177) is located at Docket No. 90; Volume II (pp. 178–369) may be found at Docket No. 91.

sand, silt, clay, and miscellaneous fill.[5] Several distinct layers of bedrock are located beneath the overburden. (Exhibit 1, Vol. XI, at pp. 304789–95; Exhibit 1, Vol. XVII, at pp. 500009–10).

13. Groundwater flowing under the Necco Park Site in the upper portion of the bedrock generally moves to the south. Groundwater in the lower portion of the bedrock generally moves to the west. (Exhibit 1, Vol. XIII, at p. 400054; Exhibit 1, Vol. XVII. at pp. 50014–15).

14. The Falls Street Tunnel is an underground storm sewer located approximately 2400 feet southwest of Necco Park. The tunnel carries storm water west to the Niagara River. (Exhibit 1, Vol. XIV, at p. 400032; Exhibit 1, Vol. XVII, at p. 500024).

15. In dry weather, all of the water flow from the Falls Street Tunnel is treated at the Niagara Falls Publicly Owned Treatment Works before it is discharged into the Niagara River. However, in wet weather, some of the water bypasses treatment and is discharged directly into the river. (Exhibit 1, Vol. XIV, at p. 401112; Exhibit 1, Vol. XVII, at p. 500012).

16. An undetermined amount of groundwater flowing south in the upper bedrock layer under the Necco Park Site flows into the Falls Street Tunnel. (Exhibit 1, Vol. XIV, at p. 401112; Exhibit 1, Vol. XVII, at pp. 500014–15, 500024).

17. Any groundwater flowing south from the Site in the upper bedrock that does not enter the Falls Street Tunnel continues flowing south directly into the Niagara River. (Exhibit 1, Vol. XII, at p. 900016–17; Exhibit 1, Vol. XIII, at p. 400043).

18. The New York Power Authority ("NYPA")[6] conduits are two parallel underground tunnels located approximately 3700 feet west of Necco Park. The NYPA conduits carry water north from the Niagara River to the Forebay Canal for use by the Robert Moses Power Station. Water from the Forebay Canal is released into the Niagara River untreated. (Exhibit 1, Vol. V., at pp. 301843–845; Exhibit 1, Vol. XIII, at p. 400032; Exhibit 1, Vol. XVII, at pp. 500011–13, 500024–25; Exhibit 1, Vol. XII, at pp. 900001–39).

19. Groundwater flowing into the drainage system surrounding the NYPA conduits moves either north or south. When the water flows north, it seeps into the Forebay Canal; when flowing south, it seeps into the Falls Street Tunnel. (Exhibit 1, Vol. V, at pp. 301843–845; Exhibit 1, Vol. XIII, at p. 400032; Exhibit 1, Vol. XVII, at pp. 500011–13, 500024–25; Exhibit 1, Vol. XII, at pp. 900001–39).

20. Groundwater flowing west in the lower bedrock under the Necco Park Site flows into the drainage system surrounding the NYPA conduits. (Exhibit 1, Vol. V, at pp. 301843–845; Exhibit 1, Vol. XIII, at p. 400032; Exhibit 1, Vol. XVII, at pp. 500011–13, 500024–25; Exhibit 1, Vol. XII, at pp. 900001–39).

21. Residential areas are located between Necco Park and both the NYPA conduits and the Falls Street Tunnel. (Exhibit 1, Vol. XVII, at p. 500009).

**C. Nature and Extent of Contamination**

22. The Necco Park Site is contaminated with both solid and liquid hazardous

---

**5.** "Overburden" is defined as "loose soil, sand, gravel, or similar material above a bedrock." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1606 (1986).

**6.** A list of acronyms may be found *infra* at p. 256.

waste. (Exhibit 1, Vol. XVII, at p. 500015).

23. The solid waste consists of contaminated fill material that Defendant placed in the landfill and surrounding contaminated soils. (Exhibit 1, Vol. VII, at pp. 302968–969; Exhibit 1, Vol. XIII, at pp. 400062–63; Exhibit 1, Vol. XVII, at p. 500016).

24. The liquid contamination consists of both dense non-aqueous phase liquid ("DNAPL") and aqueous phase liquid contamination. (Exhibit 1, Vol. XIII, at pp. 400063–64; Exhibit 1, Vol. XVII, at p. 500016).

25. Aqueous phase liquid contamination is dissolved in and moves with the groundwater. (Exhibit 1, Vol. XIII, at pp. 400063, 400065–66; Exhibit 1, Vol. XVII, at pp. 500020–21).

26. DNAPL contamination seeps into the bedrock and acts as a continuous source of dissolved groundwater contamination. (Exhibit 1, Vol. VII, at p. 302990; Exhibit 1, Vol. XIII, at p. 400064; Exhibit 1, Vol. XIV, at p. 400942).

27. DNAPL contamination at the Necco Park Site has spread horizontally beyond the boundaries of the landfill and vertically through every bedrock layer. (Exhibit 1, Vol. XIII, at pp. 400064–65; Exhibit 1, Vol. XIV, at pp. 400579, 400950, 400956–962).

28. The Environmental Protection Agency ("EPA") designated the area consisting of contaminated fill material and DNAPL as the "Source Area." The Source Area includes areas where DNAPL has been observed in samples from groundwater monitoring wells and areas where the level of dissolved contamination in samples was so high that it indicated the presence of DNAPL in the vicinity. (Exhibit 1, Vol. XIII, at p. 400064; Exhibit 1, Vol. XIV, at p. 400944; Exhibit 1, Vol. XVII, at p. 500020).

29. The Source Area was so-designated because it serves as a continuing source of groundwater contaminator in the region. (Exhibit 1, Vol. XIII, at pp. 40064–65; Exhibit 1, Vol. XVII, at p. 500020).

30. The EPA designated the area outside of the Source Area where groundwater contamination from Necco Park has spread as the "Far Field." (Exhibit 1, Vol. XIII, at pp. 400065–67; Exhibit 1, Vol. XVII, at pp. 500020–21).

31. During the investigation of groundwater contamination related to the Necco Park Site, the EPA used a list of hazardous substances known as the Necco Park Indicator Parameter List ("NPIPL"). (Exhibit 1, Vol. V, at pp. 301803–804, 301816–817).

32. The NPIPL was used to identify contamination from the Site and differentiate it from contamination from other sources. (Exhibit 1, Vol. III, at p. 300960).

33. The hazardous substances included in the NPIPL are consistent with the substances known to have been in the industrial waste that Defendant disposed of at the landfill. (Exhibit 1, Vol. V, at p. 302005).

34. In each layer of bedrock beneath the Necco Park Site, groundwater contamination has spread beyond the boundaries of the original landfill. In most of the bedrock layers, contamination has spread at least to the Falls Street Tunnel and NYPA conduits. (Exhibit 1, Vol. XIII, at pp. 400466–472).

35. Contaminants on the NPIPL were found in samples collected from the Falls Street Tunnel and the NYPA conduit drainage system. (Exhibit 1, Vol. V, at pp. 301864–867, 301999; Exhibit 1, Vol. XVII, at p. 500023).

## II. History of EPA Activity at the Necco Park Site

### A. RCRA § 3013 Order and Related Consent Decree

36. On April 29, 1985, the EPA issued a unilateral administrative order pursuant to section 3013(a) of the Resource Conservation and Recovery Act ("RCRA"). That order directed Defendant to develop and implement a groundwater assessment plan for Necco Park. (Exhibit C attached to Defendant's Trial Exhibit A; Docket No. 52, at p. 2).

37. The EPA issued the RCRA § 3013 order (the "RCRA Order") because it determined that the release or threatened release of hazardous substances from Necco Park might "present a substantial hazard to human health or the environment." (Exhibit C attached to Defendant's Trial Exhibit A, at p. 5).

38. The RCRA Order was part of a coordinated effort to identify and assess potential human health and environmental hazards posed by several confirmed and suspected waste sites located in the City of Niagara Falls. Necco Park was one of the confirmed waste sites. The EPA determined that the RCRA Order "was necessary to keep the investigation moving as rapidly as possible, while coordinating it with other related regulatory actions in the area." (Exhibit V, at pp. 15–16).

39. During this same period, the EPA negotiated a RCRA consent order with the owner of the CECOS facility. The EPA and New York State Department of Environmental Conservation ("NYDEC") determined that the investigations of Necco Park and the CECOS facility should be conducted simultaneously. (Exhibit V, at p. 15; Tr. at 351–52).

40. Defendant challenged the validity of the RCRA Order by filing a lawsuit in the United States District Court for the Western District of New York. In that action, Defendant sought, inter alia, a preliminary injunction restraining the EPA from enforcing the RCRA Order. (Exhibit A, at p. 2).

41. On June 10, 1985, the Honorable John T. Elfvin, United States District Judge for the Western District of New York, filed a Decision and Order denying Defendant's Motion for a Preliminary Injunction. E.I. duPont de Nemours & Co. v. Daggett, 610 F.Supp. 260, 264 (W.D.N.Y. 1985).

42. In July of 1986, Defendant and the EPA entered into a Consent Decree. Under the terms of that decree, Defendant was required to perform groundwater assessment studies and report the results to the EPA. (Exhibit 14, at pp. 0000042, 0000058–74).

43. Defendant also agreed to prepare an Interpretative Report. This report was to include an evaluation of whether the information collected regarding Necco Park was "adequate to ascertain the full nature and extent of any substantial hazard that past and continuing releases ... may present to human health or the environment." (Exhibit 14, at pp. 0000037–38, 0000042, 0000074–75; Tr. at 67–68; Exhibit C attached to Defendant's Trial Exhibit A, at pp. 19–20).

44. Defendant began performing the work required under the Consent Decree in July of 1986. That work, which took several years to complete, included an evaluation of the existing groundwater monitoring wells, installation of additional monitoring wells, analysis of the groundwater flow in the area, investigation of man-made passageways, and investigation of drainage swells. (Docket No. 52, at p. 2; Exhibit 1, Vol. XI, at pp. 304755–775, 304862–871).

45. Neither the RCRA Order nor the Consent Decree contained any reference to CERCLA or the National Contingency Plan ("NCP"). (Tr. at 103).

46. Between May of 1985 and September of 1989, the EPA, through its personnel and contractors, supervised and monitored Defendant's performance of the work required under the RCRA Order and Consent Decree. (Tr. at 66, 68, 76–77).

47. The Consent Decree was terminated on July 16, 1992, when the EPA informed Judge Elfvin that Defendant had completed its obligations. (Tr. at 66, 68, 76–77; Docket No. 52, at p. 3).

**B. AOC and Related Work**

48. In September of 1989, the EPA and Defendant entered into an Administrative Order on Consent ("AOC") pursuant to CERCLA §§ 104(b) and 122. (Exhibit 13; Docket No. 52, at pp. 2–3).

49. Under the AOC, Defendant was required to perform additional investigations and assessments and conduct an analysis of remedial alternatives. Defendant's work was subject to EPA oversight and approval. (Exhibit 13, at pp. 0000091–93, 0000095, 0000101–102; Tr. at 70, 72–74, 104–105).

50. The AOC was intended to continue the work conducted under the RCRA Order and Consent Decree, and lead to the completion of a Remedial Investigation/Feasibility Study ("RI/FS"). (Exhibit 13, at pp. 0000091–93, 0000095, 0000101–102; Tr. at 70, 72–74, 104–105).

51. In February of 1993, the EPA's contractor completed a site inspection evaluation of the Necco Park Site and issued a site inspection report. (Exhibit 1, Vol. XVIII, at p. DUP 14781).

52. That report indicated that the Site had been given a "No Further Remedial Action Planned" ("NFRAP") designation on CERCLIS, the EPA's database and data management system. (Exhibit 1, Vol. XVIII, at p. DUP 14781, Reference 1).

53. In September of 1993, the EPA issued a Remedial Site Assessment Decision. The purpose of this decision was to determine whether the Necco Park Site would be listed on the National Priorities List ("NPL"). In that decision, the agency concluded that the Site did not qualify for further remedial assessment and would not be listed on the NPL. (Exhibit 1, Vol. XVIII, at p. DUP 14780; Exhibit 1, Vol. XVIII, EPA Memorandum; Tr. at 262).

54. Defendant thereafter presented the EPA with an Investigation Report and Analysis of Alternatives Report, which the agency approved in May 1994 and July 1996, respectively. (Tr. at 70–71).

**C. Risk Assessment**

55. In 1993, the EPA conducted a Risk Assessment to determine whether contamination from the Necco Park Site posed any danger to human health or the environment. (Exhibit 1, Vol. VII, at p. 302955).

56. The Risk Assessment was a "baseline" assessment, which meant that it assumed that no remedial action had been taken with respect to the Site. (Exhibit 1, Vol. XVII, at pp. 500028–29).

57. According to the Risk Assessment, the current use of groundwater contaminated by the Site posed no risk to human health. However, the potential future use of contaminated groundwater posed a significant risk to human health. (Exhibit 1, Vol. XIII, at p. 400078; Exhibit 1, Vol. XVII, at p. 500031).

58. The groundwater risk assessment was based upon three assumptions. First, that a private drinking well would be installed in a residential area downgradient

of the Necco Park Site.[7] Second, that the system of recovery wells currently in operation at the Site would cease operation. Third, that the contaminants detected in the well were attributable to the Necco Park Site. (Exhibit 1, Vol. VII, at p. 303091).

59. The Risk Assessment determined that under those circumstances the risk of acquiring cancer through contact with the groundwater would be at least 6–in–1000. The risk might be as high as 1–in–1, depending upon the bedrock layer from which the groundwater was drawn and the type of contact, *e.g.* ingestion, dermal, inhalation. (Exhibit 1, Vol. VII, at p. 303034).

60. These risks are significantly higher than the EPA's maximum acceptable carcinogenic risk of between 1–in–10,000 and 1–in–1 million. (Exhibit 1, Vol. VII, at p. 303032).

61. The Risk Assessment also used a "chronic hazard index" to measure the potential for non-carcinogenic health effects, such as nervous system disorders, kidney problems, and liver problems. (Exhibit 1, Vol. VII, at p. 303033; Exhibit 1, Vol. XVII, at p. 500030).

62. A chronic hazard index of one or greater indicates the potential for non-carcinogenic health effects. (Exhibit 1, Vol. VII, at p. 303033; Exhibit 1, Vol. XVII, at p. 500030).

63. The Risk Assessment determined that the chronic hazard index for contact with groundwater contaminated by the Necco Park Site is at least 30 and possibly as high as 10,000, depending upon the bedrock layer from which the groundwater is drawn and the type of contact. (Exhibit 1, Vol. VII. at p. 303035).

64. In addition, the Risk Assessment found that in the area where the Falls Street Tunnel discharges into the Niagara River, maximum concentrations of some contaminants associated with the Site exceeded federal and state criteria. (Exhibit 1, Vol. VII, at p. 303083; Exhibit 1, Vol. XVII, at p. 500159).

65. Further, the Assessment determined that two contaminants associated with the Necco Park Site have the potential to bioconcentrate (*i.e.* accumulate in tissue) in fish and have, in fact, been found in fish tissue samples. (Exhibit 1, Vol. VII, at p. 303084; Exhibit 1, Vol. XVII, at p. 500187).

66. A public water supply currently serves the residential areas downgradient of the Site. (Exhibit 1, Vol. VII, at p. 303091; Exhibit 1, Vol. XIII, at p. 400024).

67. Nevertheless, the EPA considered domestic use of groundwater to be a potential future risk because the groundwater had been used for domestic purposes in the past and New York State classifies the groundwater as a potential drinking water source. (Exhibit 1, Vol. XVII, at pp. 500178, 500023–24).

**D. ROD**

68. On September 18, 1998, following a public notice and comment period, the EPA issued a Record of Decision ("ROD") for the Necco Park Site. (Exhibit 1, Vol. XVII, at p. 500001).

69. The ROD selected the remedy for addressing the release of hazardous substances at the Site. According to EPA estimates contained in the ROD, it will cost Defendant more than $65 million to

---

**7.** With respect to the movement of groundwater, "downgradient" refers to the downstream direction from a point of reference.

implement the selected remedy. (Exhibit 1, Vol. XVII, at p. 500006; Tr. at p. 72).

70. In reaching its decision, the EPA considered the Analysis of Alternatives Report, which identified thirteen potential remedial alternatives. Among the alternatives that the EPA considered were the "no action" alternative (Alternative 1) and the combination of response measures that Defendant had voluntarily implemented at the Site (Alternative 2). (Exhibit 1, Vol. XIII, at pp. 400284–292, 400297–432)

71. The EPA selected a modified version of the remedial alternative identified as "Alternative 10." This alternative involves the use of groundwater extraction wells to prevent contaminated groundwater from moving beyond the Source Area. (Exhibit 1, Vol. XVII, at pp. 500002–04, 500021).

72. In addition, the selected remedy includes monitoring of the groundwater in the Far Field to determine whether limiting the contamination source will allow the groundwater contamination in that area to attenuate naturally. (Exhibit 1, Vol. XVII, at pp. 500004, 500021, 500156–157).

73. The EPA determined that the selected remedy is superior to the response measures that Defendant voluntarily installed at the Site. The agency estimated that, even if the recovery wells installed and operated by Defendant achieved optimal pumping conditions, more than thirteen pounds of hazardous substances would migrate from the Source Area to the Far Field every day. Further, the agency noted that the wells do not, in fact, achieve optimal pumping conditions. (Exhibit 1, Vol. XIII, at pp. 400036, 400488; Exhibit 1, Vol. XVII, at pp. 500160, 500207).

74. In contrast, the EPA estimated that the remedial alternative selected in the ROD will allow only one pound of migration per day. Moreover, virtually all of that migration will occur in the lowest portion of the bedrock, which has far less groundwater flow than other layers. In addition, the capture zones of the wells installed pursuant to the selected remedy will encompass the Source Area, unlike the existing wells. (Exhibit 1, Vol. XIV, at p. 400550; Exhibit 1, Vol. XVII, at pp. 500023, 500160, 500199).

75. The EPA also concluded that the selected remedy is consistent with regulatory approaches in place at other sites in the region that contribute to contamination of the Niagara River and Great Lakes. Further, the agency determined that the remedy is consistent with the 1978 Great Lakes Water Quality Agreement between the United States and Canada. (Exhibit 1, Vol. XVII, at pp. 500052–53, 500175).

76. As part of the ROD, the EPA prepared a Responsiveness Summary, in which the agency responded to various concerns and questions expressed by Defendant and members of the public. (Exhibit 1, Vol. XVII, at pp. 500140–209).

**E. UAO**

77. On September 28, 1998, the EPA issued a Unilateral Administrative Order ("UAO") to Defendant pursuant to section 106(a) of CERCLA. (Exhibit 2; Tr. at 72).

78. The UAO directed Defendant to implement the remedial alternative selected in the ROD, subject to EPA oversight and approval. Further, the order required that all work under the UAO be performed in a manner consistent with the NCP. (Tr. at 75–76; Exhibit 2, at p. 22).

79. The EPA's decision to issue the UAO was based upon "the entirety of the administrative record." (Exhibit 2, at p. 6).

80. After reviewing the materials contained in the Administrative Record, the

EPA determined that the "[a]ctual or threatened release of hazardous substances at and from the Site, if not addressed by implementing the response actions selected in the ROD, may present an imminent and substantial endangerment to the public health, welfare, or environment." (Exhibit 2, at p. 5).

## III. CERCLA § 107 Cost–Recovery Litigation

### A. Procedural History

81. Plaintiff commenced this action on September 17, 2001, by filing a Complaint in the United States District Court for the Western District of New York. (Docket No. 1).

82. Defendant filed its Answer and a Counterclaim on January 28, 2002. (Docket No. 3).

83. On December 26, 2002, Plaintiff filed a Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Docket No. 24).

84. Defendant filed a Motion for Partial Summary Judgment on January 21, 2003. (Docket No. 30).

85. On September 29, 2003, this Court filed a Decision and Order granting in part and denying in part Plaintiff's motion and denying Defendant's motion. (Docket No. 52).

86. Counsel for the parties filed numerous pre-trial motions, which this Court resolved in a bench decision issued on April 23, 2004.

87. A non-jury trial was held on April 26, 2004 and April 27, 2004. (Docket Nos. 90, 91).

88. Thereafter, counsel for the parties filed post-trial submissions, including Proposed Findings of Fact and Conclusions of Law. (Docket Nos. 92, 93, 95, 97, 98, 100, 102, 104, 106, 107, 108).

### B. Documentation of EPA Response Costs

89. Plaintiff brings this action pursuant to CERCLA's cost-recovery provision, section 107. Among the costs that Plaintiff seeks to recover are costs incurred by the EPA in connection with the investigation and remediation of hazardous substances at the Necco Park Site. (Docket No. 1).

90. The EPA used funds from the Hazardous Substance Superfund (the "Superfund") to respond to the release or threatened release of hazardous substances at the Necco Park Site. (Docket No. 89, at ¶ 1).[8]

91. Plaintiff's Trial Exhibits 4, 5, and 11 are accurate summaries of the documentation of the costs incurred by the EPA with respect to the Site. (Docket No. 89, at ¶ 1).

92. The documentation that forms the basis of the summaries contained in Exhibits 4, 5, and 11 satisfies the documentation requirements contained in all relevant versions of the NCP. (Docket No. 89, at ¶ 1).

93. Personnel employed by the EPA performed work related to the Necco Park Site. This work included oversight of investigations performed by Defendant, preparation of the Risk Assessment, preparation of proposed plans for the Site, preparation of the ROD, response to comments from Defendant and the public regarding the proposed remedy, maintenance of Site files, and oversight of the remedial design process. (Tr. at 66–77).

---

**8.** Citations to Docket No. 89 refer to a Stipulation as to Facts and Exhibits, filed jointly by the parties on April 19, 2004.

94. As indicated in Exhibit 11, the EPA incurred costs in the amount of $1,530,746.91 during the time period between May 12, 1985 and April 27, 1996. By agreement of the parties, this amount should be reduced by $194,716.21. As such, Plaintiff seeks to recover $1,336,030.70 of the costs documented in Exhibit 11. (Exhibit 11; Docket No. 89, at ¶ 2; Tr. at 79–80).

95. As reflected in Exhibit 4, the EPA incurred response costs in the amount of $60,667.96 for the period between September 24, 1998 and September 30, 1999. (Exhibit 4; Tr. at 86–87).

96. Exhibit 5 indicates that the EPA incurred response costs in the amount of $186,746.34 during the period between October 1, 1999 and April 22, 2002. (Exhibit 5; Tr. at 90).

97. The cost figures in Exhibits 4, 5, and 11 include indirect administrative costs. The methodologies used to calculate these indirect costs are appropriate and consistent with applicable federal accounting standards. (Docket No. 89, at ¶ 5).

98. The total amount of past response costs sought by Plaintiff on behalf of the EPA in this action in $1,583,445.00. "Past response costs" refers to costs incurred in connection with the Necco Park Site prior to April 22, 2002. (Docket No. 89, at ¶ 4).

99. The EPA has continued to incur costs for response action related to the Site since April 22, 2002. The agency will incur response costs in the future, including costs for the oversight of the remedial action. For purposes of the present case, these costs are considered "future response costs." (Tr. at 93–94).

## C. Documentation of DOJ Enforcement Costs

100. Plaintiff also seeks to recover costs incurred by the United States Department of Justice ("DOJ") in connection with Necco Park litigation.

101. Between October 2000 and May 2002, attorneys and paralegals employed by the DOJ's Environment and Natural Resources Division performed work related to the Necco Park Site.(Exhibit 29; Tr. at 128–30).

102. Plaintiff's Trial Exhibit 29 accurately summarizes the costs incurred by the DOJ in connection with the Site between October 2000 and May 2002. (Tr. at 129–131).

103. The DOJ incurred costs totaling $225,133.42 in connection with the Necco Park Site during that period. (Exhibit 29; Tr. at 147, Docket No. 89, at ¶ 4).

104. The DOJ contracted with the accounting firm of Rubino & McGeehin to assist in the tracking of costs incurred in the prosecution of cases on behalf of the EPA. (Tr. at 119–120).

105. The DOJ assigns a number to each case for cost-tracking purposes. The number assigned to the Necco Park case is 90–11–3–07299. (Tr. at 123–124).

106. The DOJ's costs may be divided into three categories: (i) direct labor costs, (ii) other direct costs, and (iii) indirect costs. (Tr. at 130).

### i. Direct Labor Costs

107. "Direct labor costs" are the salaries paid to lawyers and paralegals for their work on a case. These costs are calculated by multiplying each employee's hourly rate of pay by the number of hours reported by that employee for a particular case. The employee's hourly rate is calculated bi-weekly by dividing the employee's salary for that period by the total number of hours reported by the employee during that period. (Tr. at 130, 132–33).

108. DOJ employees report their time for all activities through an electronic time reporting system. To report time for a particular case, the employees use the DOJ number assigned to that case. Internal controls are in place to ensure the accuracy of each employee's time entries. (Tr. at 124, 133–34, 157–58).

109. Exhibits 31 and 32 accurately summarize the hours that DOJ attorneys and paralegals charged in connection with the Necco Park Site between October 2000 and May 2002. In addition, those exhibits accurately summarize the biweekly hourly rates for those employees and the corresponding labor costs. (Exhibit 31; Exhibit 32; Tr. at. 134–35).

110. DOJ employees charged a total of 2160 hours in connection with the Site between October 2000 and May 2002. (Tr. at 137).[9]

### ii. Other Direct Costs

111. "Other direct costs" are expenses, other than labor costs, specifically linked to litigation concerning the Necco Park Site. For example, other direct costs include fees paid for expert witnesses, travel expenses, litigation support services, and transcripts. (Tr. at 137–138).

112. Exhibits 33, 34, and 35 accurately document the "other direct costs" incurred by the DOJ with respect to Necco Park litigation. (Exhibit 33; Exhibit 34; Exhibit 35; Tr. at 138).

### iii. Indirect Costs

113. "Indirect costs" are the costs that the DOJ incurred while supporting the

work of its employees. These costs include office space, administrative support, payroll taxes, compensated absences, and fringe benefits. (Tr. at 124–125, 139).

114. Indirect costs are allocated to an individual case by using an indirect cost rate. This rate is calculated by dividing the total indirect costs incurred by the Environment and Natural Resources Division for each fiscal year by the total direct labor costs for that year. The indirect costs for a particular case are calculated by multiplying the direct labor costs charged to that case each year by the indirect cost rate for that year. (Tr. at 139–140).

115. The system used to identify and calculate the DOJ's indirect costs resulted in an accurate calculation of those costs. Further, the methodology used to allocate indirect costs to the Necco Park case resulted in an accurate and equitable allocation of all such costs. (Tr. at 152–153).

116. Additional costs have been incurred by the DOJ since May 31, 2002, with respect to litigation involving the Necco Park Site. (Tr. at 147).

### D. Summary of Administrative Record

117. Exhibit 1 is the Administrative Record supporting the EPA's selection of a remedy for the Necco Park Site.

118. Exhibit 2 contains the UAO issued in September 1998 and the Administrative Record supporting the EPA's decision to issue that order. In addition, Plaintiff has

---

9. This Court's review of the relevant exhibits indicates that the total number of hours charged by DOJ employees was 2,138.25. (Exhibit 30, at p. 13; Exhibit 31, at p. 5; Exhibit 32, at p. 5). However, as noted above, the trial testimony was that the total number of hours charged was 2160. This

figure was also adopted by the parties in their post-trial submissions. (Docket No. 93, at p. 12; Docket No. 97, at p. 12). In any event, this discrepancy is immaterial due to the parties' stipulation regarding the total amount of past DOJ enforcement costs sought by Plaintiff in this action. (Docket No. 89, at ¶ 4).

incorporated by reference all of the materials contained in Exhibit 1 into Exhibit 2.

119. The Interpretive Report is located in Exhibit 1, Vols. X–XII, at pp. 304161–5303. The Investigation Report is included in Exhibit 1, Vols. V–VII, at pp. 301776–2947. These reports were prepared pursuant to 40 C.F.R. § 300.430(d), which requires that a remedial investigation be conducted to characterize a hazardous waste site and to determine the nature and extent of contamination.

120. The Risk Assessment Report is located in Exhibit 1, Vol. VII, at pp. 302948–3374. This report satisfied the requirement under the NCP that a "baseline" risk assessment be conducted. 40 C.F.R. § 300.430(d)(4).

121. The Analysis of Alternatives Report is found in Exhibit 1, Vols. XIII–XIV, at pp. 400001–1113. This report was prepared pursuant to 40 C.F.R. § 300.430(e), which requires the preparation of a feasibility study identifying and evaluating potential remedial alternatives.

122. The ROD, found in Exhibit 1, Vol. XVII, at pp. 500001–342, documents the EPA's selection of a remedy for the Necco Park Site, as required under 40 C.F.R. § 400.430(f).

## CONCLUSIONS OF LAW

### I. Background

1. There are four main questions presented in this case. Those questions are: First, was the EPA's use of RCRA response authority at the Site inconsistent with the NCP? Second, can Plaintiff recover the DOJ's enforcement costs related to Necco Park litigation? Third, was the EPA's decision to issue a UAO in September 1998 arbitrary and capricious? Fourth, are the EPA's oversight costs related to the UAO recoverable under CERCLA?

2. After discussing the general cost-recovery standard under CERCLA § 107, this Court will address each question in turn.

3. In December of 1980, Congress enacted CERCLA in response "to the serious environmental and health risks posed by industrial pollution." *United States v. Bestfoods,* 524 U.S. 51, 55, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998). The statute was designed to "provide for liability, compensation, cleanup, and emergency response for hazardous substances released into the environment and the cleanup of inactive hazardous waste disposal sites." *Freeman v. Glaxo Wellcome, Inc.,* 189 F.3d 160, 163 (2d Cir.1999) (quoting Pub.L. No. 96–510, 94 Stat. 2767, 2767 (1980)).

4. To that end, CERCLA "creates a regime of broad-ranging liability, permitting the government to recover its remediation expenses directly from parties responsible for pollution, and authorizing private parties to pursue contribution or indemnification from potentially responsible parties for expenses incurred responding to environmental threats." *Commander Oil Corp. v. Barlo Equip. Corp.,* 215 F.3d 321, 326 (2d Cir.2000).

5. CERCLA also created the "Superfund" to finance federal efforts to respond to the release or threatened release of hazardous substances into the environment. 26 U.S.C. § 9507.

6. Under CERCLA, the federal government may either remediate hazardous waste sites itself or require responsible parties to conduct the cleanup. 42 U.S.C. §§ 9604(a), 9606.

7. The EPA can finance cleanup efforts through the use of Superfund resources and then replenish the fund through cost-recovery actions under section 107 of CERCLA. *New York v. Shore Realty*

*Corp.,* 759 F.2d 1032, 1041 (2d Cir.1985) (citing 42 U.S.C. § 9611); *Bestfoods,* 524 U.S. at 55, 118 S.Ct. 1876 (citing 42 U.S.C. § 9607).

8. CERCLA § 107 provides, in pertinent part, that subject only to certain enumerated defenses, and "[n]otwithstanding any other provision or rule of law," a responsible party is liable for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a).

9. This cost-recovery provision is designed to ensure that "those actually 'responsible for any damage, environmental harm, or injury from chemical poisons [may be tagged with] the cost of their actions.'" *Bestfoods,* 524 U.S. at 55–56, 118 S.Ct. 1876 (alteration in original) (citation omitted).

■ 10. In the present case, to succeed on its claim under CERCLA § 107, Plaintiff must establish the following five elements: (i) the Necco Park Site is a "facility" under CERCLA, (ii) there has been a release or threatened release of a hazardous substance(s) at the Site, (iii) the release or threatened release caused Plaintiff to incur response costs, (iv) those costs were not inconsistent with the NCP, and (v) Defendant is a "responsible person" under CERCLA. *United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 719–20 (2d Cir.1993).

11. It is undisputed that the Necco Park Site is a "facility," as that term is defined under CERCLA. (Docket No. 52, at p. 8).

12. It is also undisputed that there has been a release of hazardous substances at the Site. (Docket No. 52, at p. 8).

13. Both parties agree that Defendant, as the owner of Necco Park, is a "responsi-

ble person" under CERCLA § 107(a)(1). (Docket No. 52, at p. 8).

14. There is also no genuine dispute regarding the fact that the release or threatened release of hazardous substances at the Necco Park Site caused Plaintiff to incur at least some "response costs." (Docket No. 52, at pp. 8–16).

15. The principal point of disagreement between the parties concerns the relationship between the response costs and the NCP.

16. Plaintiff may recover "all costs of removal or remedial action . . . *not inconsistent* with the [NCP]." 42 U.S.C. § 9607(a)(4)(A) (emphasis added). The NCP is a series of regulations promulgated by the EPA pursuant to CERLCA. 42 U.S.C. § 9605. It "governs cleanup efforts by 'establish[ing] procedures and standards for responding to releases of hazardous substances.'" *Shore Realty,* 759 F.2d at 1041; *see also United States. v. Chapman,* 146 F.3d 1166, 1170 (9th Cir.1998) (noting that the NCP is "a national plan the EPA was required to promulgate to guide federal and state response actions"); *New York v. Green,* No. 01–CV–196A, 2004 WL 1375555, at *8 (W.D.N.Y. June 18, 2004).

■ 17. In cases where, as here, the federal government seeks to recover response costs under CERCLA § 107, "[t]he response costs' consistency with the national contingency plan is presumed; the defendant bears the burden of proving inconsistency, and it must show 'that the EPA acted arbitrarily and capriciously in choosing a particular response action.'" *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 528 (2d Cir.1996) (citation omitted).

■ 18. Under the "arbitrary and capricious" standard of review,

Agency action will be set aside only if: "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *United States v. Alcan Aluminum Corp.*, 97 F.Supp.2d 248, 272 (N.D.N.Y.2000) (quoting *United States v. Burlington N. R.R. Co.*, 200 F.3d 679, 689 (10th Cir. 1999)).

■ 19. When resolving allegations of inconsistency with the NCP, courts look to the version of the NCP that was in effect at the time the EPA took the response action at issue. *Chapman*, 146 F.3d at 1170 n. 3 (citing *Wash. State Dep't of Transp. v. Wash. Natural Gas Co.*, 59 F.3d 793, 802 (9th Cir.1995)); *United States v. Chrysler Corp.*, 168 F.Supp.2d 754, 764 (N.D.Ohio 2001); *Pichowicz v. Atl. Richfield*, 37 F.Supp.2d 98, 101 (D.N.H.1997).

## II. Recovery of Costs Related to RCRA Order and Consent Decree

20. As noted above, the EPA issued the RCRA Order to Defendant in April of 1985. The parties later entered into a Consent Decree related to that order.

21. "RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 483, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996); *see also Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 331, 114 S.Ct. 1588, 128 L.Ed.2d 302 (1994) (noting that RCRA "empowers EPA to regulate hazardous wastes from cradle to grave....").

22. Under RCRA § 3013, if the EPA determines that the presence of hazardous waste at a particular site, or the release of waste from that site, might present "a substantial hazard to human health or the environment," it has the power to issue an order requiring the owner or operator of the site "to conduct such monitoring, testing, analysis, and reporting with respect to such facility or site as the Administrator deems reasonable to ascertain the nature and extent of such hazard." 42 U.S.C. § 6934(a).

23. In this action, Plaintiff seeks to recover, *inter alia*, costs that the EPA incurred while overseeing Defendant's performance under the terms of the RCRA Order and Consent Decree. Defendant contends that such costs are unrecoverable under CERCLA § 107 because the use of RCRA authority at Necco Park was inconsistent with the NCP. Defendant offers two principal arguments in support of its position.

### A. RCRA Order & Remedial Investigation

■ 24. First, Defendant argues that the issuance of the RCRA Order was inconsistent with the NCP because of the type of work that it required. Specifically, the EPA used RCRA to order Defendant to perform a remedial investigation, an outcome that the agency could not have achieved using the CERCLA authority available at the time.

25. A "remedial investigation," as that term is used in connection with CERCLA, involves the collection of information to understand the type and extent of hazardous waste contamination at a particular site. A remedial investigation "provides information to assess the risks to human health and the environment and to support the development, evaluation, and selection of appropriate response alternatives." 40 C.F.R. § 300.430(d)(1).

26. In this case, there is no dispute regarding the fact that the work conducted by Defendant under the RCRA Order and Consent Decree was, in sum and substance, a remedial investigation. (Docket No. 92, at p. 36; Docket No. 98, at pp. 4–6).[10]

27. Under the version of CERCLA in effect in 1985, the EPA could allow a responsible party to respond to the release of hazardous substances *voluntarily*, so long as the agency determined that the responsible party would perform the action "properly." This voluntary responsible party action was authorized pursuant to CERCLA § 104(a). Pub.L. 96–510, § 104(a)(1), 94 Stat. 2767, 2774–75 (1980).

28. In addition, the EPA was authorized under CERCLA § 104(b) to undertake response action itself, including a remedial investigation, to ascertain the nature and extent of any danger posed by the release or threatened release of hazardous substances. Pub.L. 96–510, § 104(b), 94 Stat. 2767, 2774–75 (1980).

29. Subsections (a) and (b) of CERCLA § 104 did *not* authorize the EPA to unilaterally order a responsible party to undertake a response action, such as a remedial investigation.[11] The EPA could only issue such an order under CERCLA § 106(a). However, the agency could issue an order under that section only if it found that the release or threatened release of hazardous substances from a site "may be an imminent and substantial endanger-

ment to the public health or welfare or the environment." 42 U.S.C. § 9606(a).

30. In the present case, the EPA did not make an "imminent and substantial endangerment" finding with respect to the Necco Park Site until September of 1998, over ten years after it issued the RCRA Order.

31. As noted *supra*, there is no genuine dispute regarding the fact that the RCRA Order was essentially a unilateral administrative order directing Defendant to conduct a remedial investigation. Defendant argues that this was inconsistent with the NCP because, under the circumstances present at the time, the EPA had no authority under CERCLA to issue this type of order.

32. As discussed above, the EPA's response actions are presumed to be consistent with the NCP and Defendant "bears the burden of proving inconsistency." *Betkoski*, 99 F.3d at 528. "To meet this burden, Defendant must show 'that the EPA acted arbitrarily and capriciously in choosing a particular response action.'" *Id.*; *see also Chrysler*, 168 F.Supp.2d at 768 (noting that "[t]o establish an inconsistency, [the defendant] must prove that the agency's actions were arbitrary and capricious") (citing *United States. v. Northeastern Pharm. & Chem. Co.*, 810 F.2d 726, 748 (8th Cir.1986)).

33. For the reasons set forth below, this Court finds that Defendant failed to establish that the EPA's decision to choose the particular response action at issue

---

**10.** Docket No. 92 refers to Defendant's Proposed Findings of Fact and Conclusions of Law. The citation to Docket No. 98 refers to Plaintiff's Response to Defendant's Proposed Findings of Fact and Conclusions of Law.

**11.** CERCLA was amended in late 1986. The revised (and current) version of CERCLA § 104(a) provides that EPA may allow a responsible party to conduct a remedial investi-

gation pursuant to a consent order, subject to several conditions. 42 U.S.C. § 9604(a) ("When the President determines that such action will be done properly and promptly by ... [a] responsible party, the President may allow such person to carry out the action, conduct the remedial investigation, or conduct the feasibility study in accordance with section 9622 of this title.").

here, the use of a RCRA order and consent decree, was arbitrary and capricious.

34. First, this Court finds that the EPA's use of RCRA authority to respond to the Necco Park Site was clearly based upon the reasoned judgment of agency professionals. CERCLA provides that the federal government is entitled to recover all of its costs for response actions not inconsistent with the NCP. 42 U.S.C. § 9607(a). "This language requires deference ... to the judgment of agency professionals." *United States v. Ward,* 618 F.Supp. 884, 900 (E.D.N.C.1985).

35. In this case, the EPA determined that the release or threatened release of hazardous substances from Necco Park might pose a danger to human health or the environment. (Exhibit C attached to Defendant's Trial Exhibit A, at p. 5). Necco Park was a confirmed hazardous waste disposal site that needed to be investigated with respect to groundwater contamination. (Exhibit V, at p. 15). The agency decided to issue the RCRA Order as part of a coordinated strategy to identify health and environmental hazards posed by several confirmed and potential waste sites. (Exhibit V, at p. 15). Both the EPA and the NYDEC concluded that the investigations of the Necco Park and the neighboring CECOS site should proceed simultaneously. (Exhibit V, at p. 15). The EPA determined that the RCRA Order "was necessary to keep the investigation moving as rapidly as possible, while coordinating it with other related regulatory actions in the area." (Exhibit V, at p. 16). This Court cannot substitute its judgment for that of the agency professionals and Defendant has failed to establish that the agency's decision in this regard was arbitrary and capricious.

36. Second, the practical effect of the RCRA order and Consent Decree was compatible with the procedures set forth under the NCP. A remedial investigation, as defined under § 300.6 of the applicable (November 1985) NCP, involves sampling, monitoring, and the gathering of other information in an effort "to determine the nature and extent of the problem presented by the release." 50 Fed.Reg. 47,912, 47,954 (Nov. 20, 1985).

Under the Consent Decree, Defendant agreed to undertake various monitoring and investigative activities to determine the nature and extent of the hazardous waste problem at Necco Park. Defendant also agreed to prepare and submit an Interpretive Report to the EPA. That report was to include an evaluation of whether the information collected was "adequate to ascertain the full nature and extent of any substantial hazard that past and continuing releases ... may present to human health or the environment." (Exhibit 14, at pp. 0000070–75).

It is readily apparent that the type of work that Defendant performed under the RCRA Order and Consent Decree was substantially similar to the type of work required in a remedial investigation under the NCP. As such, this Court finds that Defendant has not established that the practical effect of the EPA's response action was inconsistent with the procedures outlined in the NCP.

37. Third, it is true that, under the conditions present at the time, the EPA could not have issued a unilateral administrative order under CERCLA directing Defendant to conduct a remedial investigation. Such an order would have required a determination under CERCLA § 106 that the release of hazardous substances from Necco Park may have presented an imminent and substantial endangerment to the public health or welfare or the environment. As has been noted, the EPA did not make such a finding until 1998.

However, in issuing the RCRA Order, the EPA did find that the release of hazardous substances from Necco Park might present a substantial hazard to human health or the environment. (Exhibit C attached to Defendant's Trial Exhibit A, at p. 5). While this likely would not have satisfied the heightened standard under CERCLA § 106, it does not follow that the EPA's use of RCRA authority to respond to the hazard posed by the release of hazardous substances at Necco Park was therefore inconsistent with the NCP.

In other words, while the particular response action selected by EPA in this case may have been *unavailable* under CERCLA, that does not mean that it was necessarily *inconsistent* with the NCP. Defendant suggests that a response action is automatically inconsistent with the NCP if it was not specifically authorized or available under CERCLA. However, Defendant failed to cite, and this Court cannot find, any case law supporting this proposition. If Congress had intended to adopt the rule urged by Defendant, it would have limited cost recovery under § 107 to response actions that were "authorized by", "available under", or "permitted by" the NCP. Instead, the statute permits recovery for all costs of governmental response actions that were "not inconsistent" with the NCP. 42 U.S.C. § 9607(a). This is far more generous than the standard suggested by Defendant. *See Northeastern Pharm.*, 810 F.2d at 747 (holding that " 'not inconsistent' is not, at least for purposes of statutory construction and not syntax, the same as 'consistent' ").

38. Fourth and finally, the end result of the RCRA Order and Consent Decree was an investigation by the responsible party to ascertain the nature and extent of the danger posed by the release or threatened release of hazardous substances. The November 1985 NCP specifically referenced and contemplated a situation in which the responsible party would be conducting this type of investigation. Section 300.6 of that NCP provides, in pertinent part, for a remedial investigation "undertaken by the lead agency (*or* responsible party if the responsible party will be developing a cleanup proposal)." 50 Fed.Reg. 47,912, 47,952 (Nov. 20, 1985) (emphasis added).

39. In sum, this Court finds that Defendant has failed to prove that either the practical effect or ultimate result of the EPA's response action was inconsistent with the NCP. While the response action may not have been specifically authorized by CERCLA, Defendant has not shown that it was inconsistent with the NCP. Moreover, the EPA's decision to respond to the Necco Park Site using RCRA authority was based upon the reasoned judgment of agency professionals and Defendant failed to establish that the agency's decision in this regard was arbitrary or capricious.

**B. Use of RCRA Authority & *Per Se* Inconsistency with NCP**

40. Defendant's second argument is that the use of a non-CERCLA response authority is *per se* inconsistent with the NCP. Specifically, Defendant contends that the use of RCRA authority at Necco Park was inconsistent with the NCP because the NCP does not contemplate the use of response authorities other than CERCLA.

41. In this regard, Defendant notes that RCRA is neither discussed nor referenced in the NCP. In addition, the RCRA Order and Consent Decree did not contain any reference to the NCP. Moreover, while RCRA authorizes EPA to promulgate various regulations, the statute makes no reference to the NCP and compliance with the NCP is not required.

42. Defendant further notes that "[a]lthough the aims of RCRA and CERCLA are related, each serves a separate and unique purpose." *S.C. Dep't. of Health & Envtl. Control v. Commerce & Indus. Ins. Co.*, 372 F.3d 245, 256 (4th Cir.2004). While RCRA was designed to address present and prospective threats, CERCLA serves "goals that are remedial and curative rather than preventative." *Id.*

43. As such, Defendant argues that Congress did not intend that EPA action under RCRA would be treated as a "response action" for purposes of cost-recovery under CERCLA. Thus, under Defendant's theory, the use of RCRA authority would necessarily be inconsistent with the NCP and, as such, any costs incurred by the EPA in connection with the use of that authority would not be recoverable under CERCLA § 107.

44. For the reasons set forth below, this Court finds that the EPA's use of RCRA response authority is not *per se* inconsistent with the NCP.

45. First, the language of CERCLA's cost-recovery provision is very broad. CERCLA § 107(a) provides that "[n]othwithstanding *any* other provision or rule of law, and subject *only* to the defenses set forth in subsection (b) of this section ... the owner and operator of ... a facility ... *shall* be liable for ... *all* costs of removal or remedial action incurred by the United States Government ... not inconsistent with the national contingency plan ..." 42 U.S.C. § 9607(a) (emphasis added). There is nothing in this broadly worded provision to suggest that Congress intended to limit recovery to costs of response actions taken under CERCLA. Indeed, the provision's principal purpose is to ensure that "those actually 'responsible for any damage, environmental harm, or injury from chemical poisons [may be tagged with] the cost of their actions.'"

*Bestfoods,* 524 U.S. at 55–56, 118 S.Ct. 1876.

46. Second, this Court has already determined that the EPA's oversight of Defendant's performance under the RCRA Order and Consent Decree is included within the definition of "removal action" under CERCLA. (Docket No. 52, at pp. 8–16).

47. Third, several other courts have held that "[c]osts arising from RCRA compliance can be recovered in a CERCLA action." *Union Carbide Corp. v. Thiokol Corp.,* 890 F.Supp. 1035, 1044 (S.D.Ga. 1994); *Mardan Corp. v. C.G.C. Music, Ltd.,* 600 F.Supp. 1049, 1054 (D.Ariz.1984) ("CERCLA applies both to active and inactive waste disposal sites and ... RCRA compliance costs may also be considered 'response costs' under CERCLA."); *United States. v. Rohm & Haas Co.,* 790 F.Supp. 1255, 1262 (E.D.Pa.1992) ("There is no statutory expression that would prevent EPA from recovering costs incurred in supervising a so-called RCRA managed site. Instead, there are strong economic and environmental reasons for authorizing the recovery of such costs. Without a clear statutory statement to the contrary, this CERCLA remedy must be upheld as an available tool of environmental protection."), *rev'd in part on other grounds,* 2 F.3d 1265 (3d Cir.1993).

48. Fourth, although the NCP may not have specifically authorized or referenced the use of RCRA authority to respond to a hazardous waste site, that does not necessarily mean that the use of such authority is inconsistent with the NCP. Defendant has not established that use of RCRA authority in this particular case was inconsistent with the response methods outlined in the NCP. In other words, Defendant did not prove that the EPA's decision to use RCRA to respond to Necco Park was arbitrary and capricious, or otherwise inconsis-

tent with the NCP. *Betkoski*, 99 F.3d at 528 (noting that defendant bears the burden of proving that EPA acted arbitrarily and capriciously in choosing a particular response action); *cf.* *Shore Realty*, 759 F.2d at 1047–48 ("We read section 9607(a)(4)(A)'s requirement of consistency with the NCP to mean that states cannot recover costs inconsistent with the response methods outlined in the NCP."). Indeed, as has been discussed above, both the practical effect and end result of the RCRA Order and consent decree were compatible, or at least not inconsistent, with the procedures outlined under the applicable NCP.[12]

49. Accordingly, this Court finds that Defendant is liable for the response costs incurred by the EPA in connection with its oversight of Defendant's performance under the RCRA Order and Consent Decree.

## III. Recovery of Costs Related to DOJ Enforcement Activities

50. Among the response costs that Plaintiff seeks to recover in this action are direct and indirect costs incurred by the DOJ. These costs, which include attorney's fees and other litigation expenses, will be referred to collectively as the "DOJ enforcement costs."

51. As noted above, Plaintiff may recover from Defendant "all costs of removal or remedial action incurred by the United States Government … not inconsistent with the [NCP]." 42 U.S.C. § 9607(a)(4)(A). The terms "removal" and "remedial action" include "enforcement activities related thereto." 42 U.S.C. § 9601(25).

52. Offering two main arguments, Defendant contends that Plaintiff cannot recover the DOJ enforcement costs.

### A. Statutory Basis for the Recovery of DOJ Enforcement Costs

■ 53. First, Defendant asserts that there is no statutory basis for the recovery of DOJ enforcement costs incurred in connection with Necco Park litigation. Specifically, Defendant argues that § 107 cost-recovery litigation is not a "removal" or "remedial" action, as those terms are defined under CERCLA.

54. In support of its position, Defendant cites *Key Tronic Corp. v. United States*, 511 U.S. 809, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994). In *Key Tronic*, the Supreme Court held that "CERCLA § 107 does not provide for the award of private litigants' attorney's fees associated with bringing a cost recovery action." *Id.* at 819, 114 S.Ct. 1960. The Court's decision was based, *inter alia*, upon its conclusion that "the term 'enforcement activity' is not sufficiently explicit to embody a private action under § 107 to recover cleanup costs." *Id.*

55. Defendant urges this Court to apply the reasoning of *Key Tronic* to the instant case, arguing that there is no statutory basis for treating Plaintiff's claim for litigation costs differently than the private party claim at issue in *Key Tronic*.

56. The critical case guiding this Court's analysis is *B.F. Goodrich v. Betkoski*. In that case, the Second Circuit held that the Government could recover

12. In its Motion for Summary Judgment, Defendant argued that Plaintiff's claim was barred by the CERCLA statute of limitations. In the Decision and Order filed on September 29, 2003, this Court rejected that argument. (Docket No. 52, at pp. 16–19). Defendant has now asked this Court to revisit the statute of limitations issue. This Court finds that Plaintiff's claim is not barred by the applicable statute of limitations for the reasons stated and based upon the authorities cited in its September 2003 Decision and Order. The relevant portion of that decision is hereby incorporated by reference.

attorneys' fees and other indirect administrative costs under CERCLA § 107. *Betkoski*, 99 F.3d at 527–28. The court explained that:

> Responsible parties are liable for "any . . . necessary costs of response incurred [that are] consistent with the national contingency plan." [CERCLA] also states that "[t]he terms 'respond' or 'response' mean[ ] remove, removal, remedy, and remedial action," and these terms include "enforcement activities related thereto." Thus, the government's recoverable response costs properly include not only the obvious costs of remediation, but also include, *inter alia,* attorneys' fees, indirect administrative costs, studies conducted for remediation, and even prejudgment interest.

*Id.* (internal citations omitted, alterations in original).

57. The Second Circuit addressed the possible application of *Key Tronic* in a footnote:

> The appellees contend that *Key Tronic Corp. v. United States,* . . ., forecloses any claim by the government that enforcement costs can include attorneys' fees. We disagree. *Key Tronic* denied private parties the right to recovery attorneys' fees in a suit for contribution brought against the United States. The Court specifically "offer[ed] no comment on the extent to which th[e] phrase ['enforcement activities'] forms the basis for the Government's recovery of attorney's fees through § [9607]."

*Id.* at 528 n. 6 (alterations in original) (quoting *Key Tronic*, 511 U.S. at 819, 114 S.Ct. 1960).

58. The Second Circuit's holding with respect to this issue is consistent with the decisions of two other Circuits and at least two district courts. *See e.g., United States v. Dico, Inc.,* 266 F.3d 864, 878 & n. 12 (8th Cir.2001) (holding that "attorney fees are recoverable as response costs under CERCLA"); *Chapman,* 146 F.3d at 1173–76 (citing *Betkoski* and concluding "that statutory authority permits the government, which is the prevailing party in this litigation, to recover attorney fees attributable to the litigation as part of its response costs"); *Rohm & Haas Co.,* 790 F.Supp. at 1262 (holding that "Department of Justice enforcement costs . . . are recoverable"); *United States v. Northernaire Plating Co.,* 685 F.Supp. 1410, 1418 (W.D.Mich.1988) (noting that "[i]n a CERCLA action, [the United States] is entitled to all recovery costs, including attorney fees and litigation expenses incurred by the staffs of the EPA and the Department of Justice").

59. Defendant argues that *Betkoski* should be read narrowly. While conceding that the Second Circuit held that the federal government may recover *some* attorneys' fees and other enforcement costs under CERCLA § 107, Defendant notes that the court never discussed whether the costs that it deemed recoverable were "litigation-related." Moreover, the Second Circuit cited *United States v. Gurley,* 43 F.3d 1188 (8th Cir.1994), in support of its decision. Defendant contends that this citation suggests that the *Betkoski* holding is limited to the recovery of *non-*litigation related attorneys' fees and administrative costs.[13]

In sum, under Defendant's reading of *Betkoski,* the Second Circuit's decision would stand for the limited proposition that the Government's attorneys' fees and

---

**13.** In *Gurley*, the Eighth Circuit affirmed the award of *non-litigation* related attorney's fees, on the grounds that such fees "significantly benefited [*sic* ] the entire cleanup effort and served a statutory purpose apart from the reallocation of costs." *Id.* at 1199 (quoting *Key Tronic*, 511 U.S. at 820, 114 S.Ct. 1960).

other enforcement costs are recoverable *only* if they were incurred in connection with some activity other than cost-recovery litigation. Therefore, according to Defendant, the DOJ enforcement costs at issue in this case are not recoverable under *Betkoski* because those costs were related solely to litigation.

60. The question presented by Defendant's argument is: can the federal government recover attorney's fees and other litigation costs incurred in connection with a CERCLA § 107 cost-recovery action?

61. As noted above, the Supreme Court has definitively ruled that a private party cannot not recover litigation-related attorneys' fees and costs. *Key Tronic,* 511 U.S. at 819–20, 114 S.Ct. 1960. However, the Court in *Key Tronic* did find that a private party *could* seek recovery of attorneys' fees incurred for some other purpose, *i.e.* some purpose other than cost-recovery litigation. *Id.* For example, the Court stated that "some lawyers' work that is closely tied to the actual cleanup," such as "work performed in identifying other [potentially responsible parties]," would be recoverable under CERCLA § 107. *Id.* at 820, 114 S.Ct. 1960. For purposes of the instant decision, this Court will refer to this distinction between the recoverability of litigation costs and non-litigation costs as the "*Key Tronic* distinction."

62. The Second Circuit has recognized the *Key Tronic* distinction in the context of private party CERCLA actions. In *Goodrich Corp. v. Town of Middlebury,* 311 F.3d 154, 174 (2d Cir.2002), the court held that private party " 'expenses incurred solely in preparation for litigation' cannot be recovered as response costs unless they 'significantly benefitted the entire cleanup effort and served a statutory purpose apart from the reallocation of costs.' " The Second Circuit had previously reached the same conclusion in *Gussack Realty Co.*

*v. Xerox Corp.,* 224 F.3d 85, 91–92 (2d Cir.2000). In *Gussack,* the court affirmed the district court's conclusion that the plaintiff's attorneys' fees were not recoverable because they were not closely tied "to the actual cleanup of the property." *Id.*

63. In both *Goodrich,* 311 F.3d at 174, and *Gussack,* 224 F.3d at 91–92, the Second Circuit recognized, cited, and relied upon the Supreme Court's decision in *Key Tronic.*

64. This Court finds that the *Key Tronic* distinction does not apply to cost recovery claims made by the federal government. As such, based upon controlling Second Circuit precedent, the DOJ enforcement costs sought by Plaintiff are recoverable under CERCLA § 107.

65. In *Betkoski,* the Second Circuit rejected the appellees' attempt to apply *Key Tronic* to an action involving the federal government. The court explained that the *Key Tronic* case did not apply, noting that the Supreme Court had offered "no comment" on the question of whether the government could recover litigation-related fees under CERCLA § 107. *Betkoski,* 99 F.3d at 528 n. 6 (distinguishing *Key Tronic,* 511 U.S. at 819, 114 S.Ct. 1960).

The fact that the Second Circuit felt the need to distinguish *Key Tronic* in this way indicates that the enforcement costs that it found to be recoverable in *Betkoski* were litigation-related. If the Second Circuit had intended *Betkoski* to stand for the proposition that the federal government could recover only non-litigation related enforcement costs, it would not have distinguished *Key Tronic.* Rather, the court would have cited *Key Tronic* in *support* of its decision, as it did in *Goodrich* and *Gussack,* cases in which the Second Circuit held that private parties could recover only non-litigation related attorneys' fees and costs.

66. In sum, this Court finds that *Betkoski* stands for the proposition that the *Key Tronic* distinction between the recoverability of litigation and non-litigation costs does not apply to claims for enforcement costs brought by the federal government.[14] As such, the DOJ's enforcement costs incurred in connection with Necco Park litigation are recoverable under CERCLA § 107. *See Betkoski,* 99 F.3d at 528 (holding that "the government's recoverable response costs properly include not only the obvious costs of remediation, but also include, *inter alia,* attorneys' fees ... [and] indirect administrative costs....").

## B. DOJ Enforcement Costs & the NCP

■ 67. Defendant's second argument, offered in the alternative, is that Plaintiff cannot recover the DOJ enforcement costs because those costs were inconsistent with the NCP. Specifically, Defendant argues that the DOJ's records are insufficiently detailed, which makes it impossible for this Court to determine whether the enforcement costs were necessary or reasonable. As such, Defendant asserts that Plaintiff failed to comply with the NCP and its claim for enforcement costs should be denied.

68. Defendant's argument presents two general questions. First, is Plaintiff's claim for DOJ enforcement costs subject to a "necessary" or "reasonableness" standard? Second, were the DOJ enforcement costs adequately documented, as required by the NCP?

### i. "Necessary" or "Reasonableness" Standard

69. Defendant argues that by definition and statutory requirement, response ac-tions selected or undertaken by the Government must be "necessary." In this regard, Defendant notes that the definition of "removal action" under CERCLA refers to "such actions as may be *necessary* to monitor, assess, and evaluate the release or threat of release of hazardous substances." 42 U.S.C. § 9601(23) (emphasis added). The current version of the NCP defines "removal" in the same way, referring to actions deemed "necessary" to respond to the release or threatened release of hazardous substances. 40 C.F.R. § 300.5. The word "necessary" also appears in CERCLA's definition of "remedial action." 42 U.S.C. § 9601(24).

70. Further, Defendant notes that other courts have held that claims for DOJ enforcement costs are subject to a "reasonableness" standard. In *United States v. Chapman,* the Ninth Circuit vacated an award of attorneys' fees and remanded the case for consideration of "the reasonableness of the government's requested litigation expenses." 146 F.3d at 1176. The court found that the government's claim for attorneys' fees under CERCLA should have been analyzed under the framework set forth by the Supreme Court in *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

71. The Eighth Circuit reached a similar result in *United States v. Dico, Inc.,* In that case, the court stated that: "[p]resumably, any attorney fees that were not reasonably incurred would be held inconsistent with the NCP (else there would appear to be no limiting principle to a claim by the government for attorney fees as part of CERCLA response costs), but the burden would be on the responsible

---

**14.** It should be noted that the Ninth Circuit has interpreted *Betkoski* in this same way. *See Chapman,* 146 F.3d at 1174 (noting that in *Betkoski,* "the Second Circuit distinguished *Key Tronic* as applying only to private cost recovery actions, and held that attorney fees are recoverable by the government as response costs under CERCLA").

party to show unreasonableness." [15] *Dico*, 266 F.3d at 879; *see also United States v. Domenic Lombardi Realty, Inc.*, 290 F.Supp.2d 198, 213 (D.R.I.2003) (citing *Dico* and ordering the plaintiff to "submit an itemized account of attorneys fees for which it seeks reimbursement so that the Court can make a determination as to their reasonableness").

72. For the following reasons, this Court finds that Plaintiff's claim for DOJ enforcement costs is not subject to a "necessary" or "reasonableness" standard.[16]

73. First, the plain language of CERCLA § 107 provides that the United States Government may recover *"all* costs of removal and remedial action ... not inconsistent with the [NCP]." 42 U.S.C. § 9607(a)(4)(A) (emphasis added). As many other courts have recognized, "[n]o factor of reasonableness or necessity of individual remedial costs is explicitly or implicitly required." *United States v. Kramer*, 913 F.Supp. 848, 863 (D.N.J. 1995); *Northeastern Pharm.*, 810 F.2d at 748 (noting that "CERCLA does not refer to 'all *reasonable* costs' but simply to 'all costs'") (emphasis original); *United States v. S.C. Recycling & Disposal, Inc.*, 653 F.Supp. 984, 1008–09 (D.S.C.1984) ("As long as the actions taken by the government were in harmony with the national contingency plan, the costs incurred pursuant to those actions are presumed to be reasonable and therefore recoverable. If Congress had intended otherwise, they would have merely stated in section

107(a)(4)(A), 'all reasonable costs,' instead of the present language of 'all costs.'") (citation omitted) *rev'd in part on other grounds, United States v. Monsanto Co.*, 858 F.2d 160 (4th Cir.1988); *New York v. Almy Bros.*, No. 90–CV–818, 1996 WL 12031, at *3 (N.D.N.Y. Jan.8, 1996) (quoting *Northeastern Pharm.*, 810 F.2d at 747).

74. Moreover, Congress used the words "necessary" and "reasonable" in other portions of CERCLA § 107. For example, a private party may recover "any other *necessary* costs of response ... consistent with the [NCP]." 42 U.S.C. § 9607(a)(4)(B) (emphasis added). A responsible party is liable for "damages for injury to, destruction of, or loss of natural resources, including the *reasonable* costs of assessing such injury, destruction, or loss." 42 U.S.C. § 9607(a)(4)(C).

The use of the words "necessary" and "reasonable" in other CERCLA provisions "implies that Congress did consider when to make cost recovery contingent upon the necessity or reasonableness of costs." *Kramer*, 913 F.Supp. at 863. "The absence of either word in the section addressing the government's right to cost recovery clearly indicates that Congress did not intend for the EPA to be so limited." *Id.; see also United States v. Northeastern Pharm. & Chem. Co., Inc.*, 579 F.Supp. 823, 850–51 (D.Mo.1984); *rev'd in part on other grounds*, 810 F.2d 726 (8th Cir.1986).

**15.** However, the Eighth Circuit disagreed with the Ninth Circuit's conclusion regarding the application of the *Hensley* framework. *Id.* at 879 n. 13 (discussing *Chapman* and finding that the *Hensley* framework does not apply to attorneys' fees claims under CERCLA).

**16.** In a preliminary pre-trial ruling, this Court indicated that it would review Plaintiff's claim for enforcement costs under the reasonableness standard referenced in *Dico*. Upon re-

consideration and for the reasons set forth above, this Court finds that such a standard should not be applied. In addition, this Court notes that *Dico* court simply assumed that a reasonableness standard would apply, without conducting an extensive analysis of this issue. *See Dico*, 266 F.3d at 879 ("*Presumably*, any attorney fees that were not reasonably incurred would be held inconsistent with the NCP ....") (emphasis added).

75. Second, "Congress was careful to enumerate the defenses to the recoverability of all response costs." *Kramer*, 913 F.Supp. at 863. Those defenses are set forth in CERCLA § 107(b). 42 U.S.C. § 9607(b). If Congress wanted "to limit recovery to reasonable, necessary, cost-effective items, it could easily have done so in section 107(b)." *Kramer*, 913 F.Supp. at 863.

76. Third, Defendant's analysis of the CERCLA definitions is flawed. Defendant contends that the use of the word "necessary" in the CERCLA definitions of "removal" and "remedial" indicates that Plaintiff's cost recovery is limited to necessary costs. However, those definitions reference *actions* that may be necessary to respond to a hazardous waste site. There is no express or implied requirement that particular *costs* be necessary. "The fact that the phrase 'actions as may be necessary' appears several times ... in the definition [of removal] does not superimpose necessity requirements upon items of individual costs." *Kramer*, 913 F.Supp. at 864.

77. Lastly, Defendant suggests that the NCP demands that the Government's response costs be necessary and/or reasonable. However, "[t]he NCP regulates *choice of response actions*, not costs." *United States v. Hardage*, 982 F.2d 1436,

1443 (10th Cir.1992) (emphasis original). Response costs "by themselves, cannot be inconsistent with the NCP." *Id.*; *Kramer*, 913 F.Supp. at 866 (holding that "the NCP regulates response actions and, consequently, only actions can be inconsistent with the NCP."); *see also Betkoski*, 99 F.3d at 528 (noting that "[t]he response costs' consistency with the national contingency plan is presumed; the defendant bears the burden of proving inconsistency, and it must show 'that the EPA acted arbitrarily and capriciously in choosing a particular response *action*'") (emphasis added). The response action underlying the DOJ enforcement costs is the litigation involving the Necco Park Site. Defendant cannot escape liability for the enforcement costs unless it proves that the underlying litigation was inconsistent with the NCP. Defendant has made no such showing.

78. In sum, this Court finds that Defendant cannot avoid liability for the DOJ's enforcement costs by arguing that those costs were unnecessary or unreasonable.[17]

### ii. Documentation of DOJ Enforcement Costs

79. Although this Court has concluded that Defendant may not show inconsistency with the NCP by arguing that particular costs were unnecessary or unreasonable, another issue remains. Defen-

---

17. Defendant contends that this ruling essentially gives Plaintiff a "blank check." However, it is clear from the language of CERCLA § 107 that "Congress has determined that the government should not have to bear the risk of inefficient or unreasonable costs when performing the often difficult and complex tasks of remediation and that risk should be borne by those at fault." *Kramer*, 913 F.Supp. at 864. As the court in *Kramer* noted, "Congress frequently has been reminded of the harshness of CERCLA." *Id.* at 865. "The fact that Congress has not amended CERCLA's cost recovery provisions ... indicates [its] preference that PRPs, not taxpayers, bear the risk that the EPA's response actions may be more expensive than those of a private party." *Id.* In addition, as Plaintiff's counsel has noted, "Congress, the EPA, and the DOJ Inspector General exercise an oversight function to ensure that resources are used effectively." (Docket No. 98, at p. 14 & n. 9). Finally, this Court recognizes that Defendant might have been able to escape liability for response costs arising from "fraud, double-billing, or activities that [did] not relate to the lawful remedy." *Kramer*, 913 F.Supp. at 867. However, no evidence of any of these types of abuses was presented in this case.

dant might be able to establish that the DOJ enforcement costs were otherwise inconsistent with the NCP. In particular, Defendant might be able to show that the DOJ enforcement costs were not adequately documented, as required under the NCP.

80. Under the NCP, the lead agency is required to complete and maintain documentation to support cost recovery actions:

> During all phases of response, the lead agency shall complete and maintain documentation to support all actions taken under the NCP and to form the basis for cost recovery. In general, documentation shall be sufficient to provide the source and circumstances of the release, the identity of responsible parties, the response action taken, accurate accounting of federal, state, or private party costs incurred for response actions, and impacts and potential impacts to the public health and welfare and the environment. Where applicable, documentation shall state when the NRC received notification of a release of a reportable quantity.

40 C.F.R. § 300.160(a)(1).

81. As Plaintiff has acknowledged, this documentation requirement applies to the claim for DOJ enforcement costs. (Docket No. 93, at p. 29).

82. Defendant contends that the records submitted by Plaintiff in support of the claim for DOJ enforcement costs are wholly inadequate. In particular, the DOJ's time records do not describe what activity was done on a specific day or how much time was spent on a certain task. As a result, this Court cannot determine what work the attorney or paralegal was performing during the referenced time periods. In addition, Plaintiff significantly reduced the amount of its claim for past response costs from the sum originally demanded. This reduction was part of a negotiated stipulation reached by the parties on the eve of trial. However, this Court cannot determine, based upon the records provided, what part of the DOJ enforcement costs relate to claims or issues that were resolved before trial.

83. For the reasons outlined below, this Court finds that the documentation of the DOJ enforcement costs was not inconsistent with the requirements of the NCP.

84. The NCP's cost documentation provision "does not impose any additional documentation requirements on the government, beyond what is sufficient to persuade the court that the costs have been proven by a preponderance of the evidence." *United States v. W.R. Grace & Co.*, 280 F.Supp.2d 1149, 1180 (D.Mont. 2003) (citing 40 C.F.R. § 300.160). Simply stated, "this provision of the NCP ... 'does not contain any specific standards concerning the documentation of costs.'" *Id.* (quoting *Chrysler*, 168 F.Supp.2d at 769); *see also United States v. Findett Corp.*, 75 F.Supp.2d 982, 991 (E.D.Mo. 1999).

85. Under the NCP, Plaintiff was required to maintain documentation that "in general" is "sufficient" to provide an "accurate accounting" of the costs incurred. 40 C.F.R. § 300.160(a)(1). However, "the NCP does not define 'accurate accounting' or otherwise elaborate on what is meant by 'sufficient.'" *Grace*, 280 F.Supp.2d at 1180; *California Dept. of Toxic Servs. v. Neville Chem. Co.*, 213 F.Supp.2d 1134, 1138 (C.D.Cal.2002); *Chrysler*, 168 F.Supp.2d at 769; *Findett*, 75 F.Supp.2d at 991. Accordingly, "[i]n the absence of regulatory guidance on the meaning of 'accurate accounting,' courts have applied civil evidentiary standards to assess the adequacy of cost documentation supporting a CERCLA cost recovery claim, rather than

imposing any additional burden." *Grace,* 280 F.Supp.2d at 1180 (collecting cases).

86. This Court finds that the evidence presented by Plaintiff is sufficient to provide an accurate accounting of the DOJ's enforcement costs. Plaintiff submitted documentary evidence, including time records and travel vouchers, to support its claim for DOJ enforcement costs. (Exhibits 29; 31–36). In addition, Plaintiff's counsel filed a declaration summarizing the tasks worked on and completed by DOJ personnel during the time period in question. (Docket No. 95). Plaintiff also offered the testimony of William Kime, a Certified Public Accountant and acknowledged expert in cost accounting. (Docket No. 89, at ¶ 6). Mr. Kime is a shareholder in the accounting firm of Rubino & McGeehin, which has a contract with the DOJ to assist in the tracking of costs incurred in the prosecution of CERCLA cases on behalf of the EPA. Mr. Kime testified as to the methods of calculating the DOJ's direct and indirect costs. He opined that the DOJ's enforcement costs during the relevant period were accurately and equitably determined using an accounting system that met appropriate standards. (Tr. at 151–61).

87. This Court's finding with respect to this issue is consistent with the decisions of Ninth Circuit and Eighth Circuit. In *Chapman,* the Ninth Circuit held that the EPA had "adequately documented its response action and the costs incurred." 146 F.3d at 1171. The court noted that the claim for costs was supported by "detailed cost summaries ... documenting the costs incurred by the EPA, ... declarations from EPA staff, attorneys, accountants, and supervisors attesting to the work they performed and the time spent on the ... site, ... [and] extensive documentation of costs in the form of timesheets and payroll documents." *Id.*

88. In *United States v. Findett Corp.,* 220 F.3d 842 (8th Cir.2000), the Eight Circuit ruled that there was no genuine issue of material fact as to whether the response costs sought by the federal government were sufficiently documented. *Id.* at 849. This decision was based upon the fact that "[t]he EPA submitted thoroughly detailed cost summaries, supporting data, and other competent evidence to support its claim for response costs." *Id.*

89. Several district courts have reached the same conclusion when faced with questions concerning the adequacy of CERCLA cost documentation. *See, e.g., Grace,* 280 F.Supp.2d at 1181 (finding that supporting documentation, which included "cost summaries, time sheets, contractor invoices, travel vouchers, progress reports, and voluminous other information," and testimonial evidence was sufficient to support cost recovery claim); *Neville,* 213 F.Supp.2d at 1139–40 (holding that "time sheets ... provide[d] sufficient documentation to permit accurate accounting"); *Chrysler,* 168 F.Supp.2d at 769 (ruling that "documentation provided is adequate to support the contractor costs ... that EPA incurred"); *United States v. Bell Petroleum Servs.,* 734 F.Supp. 771, 781 (W.D.Tex.1990); *rev'd in part on other grounds,* 3 F.3d 889 (5th Cir.1993).

90. While Defendant contends that the DOJ records lack sufficient detail, courts have consistently "rejected arguments that the lack of descriptive information on a time sheet or travel voucher regarding the underlying task the employee performed invalidates the documentation." *Grace,* 280 F.Supp.2d at 1181; *see also Neville,* 213 F.Supp.2d at 1139–40 (noting that the defendant failed to cite "any case where a specific description of exactly what task the employee performed at a particular time was held to be required by [the NCP]"); *Bell,* 734 F.Supp. at 781 (holding

that "failure to provide descriptive documentation does not make the Government's accounting inaccurate [and] even if it did, disallowance of costs for that reason is too harsh a sanction for the omission, if any, involved").

91. For the foregoing reasons, this Court finds that Defendant failed to establish that the documentation of the DOJ enforcement costs was inconsistent with the NCP. *See Grace,* 280 F.Supp.2d at 1181 (noting that "the burden is on the CERCLA defendant to demonstrate that such documentation is inadequate once the *prima facie* case for the costs has been established"). As such, Plaintiff is entitled to recover those costs under CERCLA § 107.

## IV.  Validity of September 1998 CERCLA § 106 Order

92. The EPA issued a ROD in September of 1998, which selected a remedy for addressing the release of hazardous substances at the Necco Park Site. Several days later, the agency issued a UAO under CERCLA § 106(a). The UAO directed Defendant to implement the remedy selected in the ROD, subject to EPA oversight and approval.

93. Defendant challenges the validity of the UAO. To understand Defendant's argument, it is necessary to review the standard governing the issuance of such an order.

### A.  Standard for Issuance of UAO under CERCLA § 106(a)

94. Under CERCLA § 106(a), the EPA has the authority to issue "such orders as may be necessary to protect public health and welfare and the environment." 42 U.S.C. § 9606(a). The agency may issue such orders whenever it "determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility." 42 U.S.C. § 9606(a).

95. CERCLA does not define the phrase "imminent and substantial endangerment." However, several courts have examined its meaning in the context of CERCLA and other environmental statutes (including RCRA) that use the same terms.

96. Those courts have found that the EPA "does not have to prove that an 'imminent and substantial endangerment' actually exists." *United States v. Conservation Chem. Co.,* 619 F.Supp. 162, 192 (E.D.Mo.1985). Rather, the statute "clearly authorizes the United States to obtain relief when 'there *may* be an imminent and substantial endangerment.'" *Id.* (emphasis original) (quoting 42 U.S.C. § 9606(a)); *see also Interfaith Cmty. Org. v. Honeywell Int'l, Inc.,* 263 F.Supp.2d 796, 836 (D.N.J.2003) (under RCRA, "Plaintiffs need not show actual harm to health or the environment. It is enough to show that such an endangerment *may* exist.") (emphasis original); *United States v. Valentine,* 856 F.Supp. 621, 626 (D.Wyo. 1994) (holding that "[i]t is sufficient to demonstrate that there *may* be 'an imminent and substantial endangerment'") (emphasis original) (quoting 42 U.S.C. § 6973(a)).

97. With respect to the term "endangerment," courts have held that "[a]n 'endangerment' is not actual harm, but a threatened or potential harm." *Conservation Chem.,* 619 F.Supp. at 192; *see also Dague v. City of Burlington,* 935 F.2d 1343, 1356 (2d Cir.1991) (under RCRA, "a finding that an activity may present a imminent and substantial endangerment does not require actual harm"); *rev'd in part on other grounds,* 505 U.S. 557, 112 S.Ct.

2638, 120 L.Ed.2d 449 (1992); *Price v. United States Navy*, 39 F.3d 1011, 1019 (9th Cir.1994) (noting that "[c]ourts have ... consistently held that 'endangerment' means a threatened or potential harm and does not require proof of actual harm") (collecting cases); *Honeywell*, 263 F.Supp.2d at 837 (holding that "an 'endangerment' is present if there is merely threatened or potential harm"); *United States v. Union Corp.*, 259 F.Supp.2d 356, 400 (E.D.Pa.2003) (citing *Dague*, 935 F.2d at 1356).

■■■ 98. In addition, the EPA "does not have to show that *people* may be endangered." *Conservation Chem.*, 619 F.Supp. at 192 (emphasis original). Section 106 refers to an endangerment "to the public health *or* welfare *or* the environment." 42 U.S.C. § 9606(a) (emphasis added). The fact that the statute uses "the disjunctive 'or' mandates the conclusion that a possible endangerment to the public welfare alone, or a possible endangerment to the environment alone, will warrant relief." *Conservation Chem.*, 619 F.Supp. at 192. The term "environment" is broadly defined and includes "the navigable waters, ... and ... any other surface water, groundwater, drinking water supply, land surface or subsurface strata, or ambient air within the United States or under the jurisdiction of the United States...." 42 U.S.C. § 9601(8). "The expansive scope of the terms 'public welfare' and 'environment' mandates the conclusion that Congress intended injunctive relief to issue whenever any aspect of the nation's interest in a clean environment may be endangered imminently and substantially by a release." *Conservation Chem.*, 619 F.Supp. at 192.

■■■ 99. Once an endangerment has been established, the next question is whether it is "imminent." An endangerment is considered " 'imminent' if factors giving rise to it are present, even though the harm may not be realized for years." *Id.* at 193–94. Simply stated, "[a]n endangerment need not be immediate to be 'imminent.' " *Id.* at 193; *see also Dague*, 935 F.2d at 1356 ("An 'imminent hazard' may be declared at any point in a chain of events which may ultimately result in harm to the public.") (quoting *Envtl. Def. Fund v. EPA*, 465 F.2d 528, 533 (D.C.Cir. 1972)). "Imminence refers 'to the nature of the threat rather than identification of the time when the endangerment initially arose.' " *Dague*, 935 F.2d at 1356 (quoting *United States v. Price*, 688 F.2d 204, 213 (3d Cir.1982)).

100. As discussed above, the word "imminent" does not require "proof that harm will occur tomorrow" and the word "endangerment" does not require "quantitative proof of actual harm." *Conservation Chem.*, 619 F.Supp. at 194. In like manner, the word "substantial" does not require "quantification of the endangerment (*e.g.*, proof that a certain number of persons will be exposed, that 'excess deaths' will occur, or that a water supply will be contaminated to a specific degree)." *Id.*

■■■ An endangerment is considered substantial if "there is reasonable cause for concern that someone or something may be exposed to a risk of harm by a release or a threatened release of a hazardous substance if remedial action is not taken, keeping in mind that protection of the public health, welfare and the environment is of primary importance." *Id.; see also Honeywell*, 263 F.Supp.2d at 836; *Union Corp.*, 259 F.Supp.2d at 400.

This involves consideration of "[a] number of factors (*e.g.*, the quantities of hazardous substances involved, the nature and degree of their hazards, or the potential for human or environmental exposure)." *Conservation Chem.*, 619 F.Supp. at 194.

However, "in any given case, one or two factors may be so predominant as to be determinative of the issue." *Id.*

## B. Defendant's Challenge to the September 1998 UAO

101. Under CERCLA, "judicial review of any issues concerning the adequacy of any response action taken or ordered by the [EPA] shall be limited to the administrative record." 42 U.S.C. § 9613(j)(1).

102. In addition, when considering objections to a particular EPA response action, the court must uphold the agency's "decision in selecting the response action unless the objecting party can demonstrate, on the administrative record, that the decision was arbitrary and capricious or otherwise not in accordance with law." 42 U.S.C. § 9613(j)(2).[18]

103. The response action at issue in this case is the EPA's decision to issue the UAO in September 1998. That decision was based upon the agency's determination that the release or threatened release of hazardous substances at the Necco Park Site "may present an imminent and substantial endangerment to the public health or welfare or the environment." (Exhibit 2, at p. 6).

104. Defendant challenges the validity of the UAO, arguing that the EPA's "imminent and substantial endangerment" determination was arbitrary and capricious.

105. Defendant offers two main arguments in support of this contention. This Court will summarize the arguments and then address them in turn.

### i. Risk Assessment & Probability

106. First, Defendant argues that the EPA failed to adequately assess the risk posed by Necco Park contamination.

107. The EPA's "imminent and substantial endangerment" determination was based, in part, upon a Risk Assessment conducted in 1993. The Risk Assessment was an investigation and analysis designed to determine whether contamination from the Necco Park Site posed any risk to human health or the environment. (Exhibit 1, Vol. VII, at p. 302955). The Risk Assessment's conclusion was that the potential future use of groundwater contaminated by the Site posed a significant risk to human health. (Exhibit 1, Vol. VII, at pp. 303091–94). After considering the Risk Assessment and other materials in the Administrative Record, the EPA decided to issue the UAO. (Exhibit 2, at p. 6).

The Risk Assessment's future risk finding was based upon three assumptions: (a) that a private drinking-water well would be installed in a residential area downgradient of the Site, (b) that the system of recovery wells currently in operation at Necco Park would cease operation, and (c) that the groundwater contamination would be entirely attributable to Necco Park. (Exhibit 1, Vol. VII, at p. 303091). The Risk Assessment concluded that if all three conditions were met, a person using the contaminated groundwater would be exposed to serious health risks.

108. The EPA never evaluated the probability that all three assumptions identified in the Risk Assessment would materialize. Defendant argues that it is therefore impossible to gauge the true risk posed by future groundwater exposure. According to Defendant, a proper risk assessment would include a probability analysis concerning the likelihood that the three exposure assumptions will occur, *i.e.* the likelihood that a person would be ex-

---

18.  The "arbitrary and capricious" standard of   review is described *supra* at p. 233.

posed to contaminated groundwater in the future.

109. Moreover, Defendant asserts that there are valid reasons to believe that the occurrence of all three of these assumptions is, in point of fact, extremely unlikely. The areas identified in the Risk Assessment are currently served by a public water supply. Natural groundwater in the vicinity generally requires treatment prior to domestic use due to high mineral concentrations and hydrogen sulfide levels unrelated to Necco Park. In addition, various industrial activities in the area (not associated with Necco Park) have also contaminated the ground water. As such, Defendant contends that it is extraordinarily unlikely that a private citizen would install and use a domestic water well. Further, Defendant asserts that it is unlikely that it would stop operating the three groundwater recovery wells that it voluntarily installed many years ago. In addition, the groundwater in the area has been impacted by numerous industrial sources and Defendant argues that it is unlikely that a hypothetical future domestic well would collect water containing only Necco Park-related contaminants.

110. Defendant also contends that the facts of the instant case are analogous to those presented in *Price v. United States Navy.* In that case, the plaintiff homeowner discovered hazardous waste contamination in her backyard. *Price*, 39 F.3d at 1013. The State of California hired a contractor and remediated the site. *Id.* Thereafter, the plaintiff filed suit, arguing, *inter alia*, that the hazardous waste posed an imminent and substantial endangerment to human health or the environment. *Id.* The plaintiff contended that if she fixed a crack in a concrete slab beneath her house, a chain of events might occur that would cause the migration of contaminants beneath her home. *Id.* at 1018. The dis-

trict court found that the plaintiff had failed to produce sufficient evidence supporting her claim that she might be exposed to the contaminants. *Id.* at 1018–19. The Ninth Circuit affirmed that decision. *Id.* at 1021. In the present case, Defendant asserts that, as in *Price*, there is no "imminent and substantial endangerment" because the EPA failed to establish a realistic exposure pathway.

### ii. Use of "Baseline" Risk Assessment

111. Defendant's second argument is that the EPA's decision-making was flawed because it relied heavily upon a "baseline" risk assessment. This type of risk assessment assumes that no controls have been taken to remediate hazardous waste contamination. The Risk Assessment was a "baseline risk assessment." As such, it evaluated the risks posed by Necco Park contamination without considering the remedial measures that Defendant voluntarily installed and operated.

112. Defendant asserts that the EPA's use of this type of assessment resulted in a risk characterization that was not representative of existing conditions at the Necco Park site. Specifically, the Risk Assessment ignored the remedial measures that have been in place at Necco Park for many years. As such, Defendant contends that the EPA's "imminent and substantial endangerment" determination was arbitrary and capricious because it was not based upon the actual facts and circumstances present at Necco Park.

### C. Judicial Review of UAO

113. Defendant bears the burden of establishing that the EPA's decision to issue the UAO was arbitrary and capricious. *See* 42 U.S.C. § 9613(j)(2) (providing that courts must uphold the EPA's "decision in selecting the response action unless the

*objecting party* can demonstrate, on the administrative record, that the decision was arbitrary and capricious or otherwise not in accordance with law") (emphasis added).

114. For the following reasons, this Court finds that Defendant has not demonstrated that the EPA's decision to issue the UAO was arbitrary and capricious.

115. When reviewing the EPA's selection of a particular response action, this Court cannot simply substitute its judgment for that of the agency. The Second Circuit has held that "[d]eference is desirable" in cases involving judicial review of agency action. *Browning–Ferris Indus. of South Jersey, Inc. v. Muszynski,* 899 F.2d 151, 160 (2d Cir.1990). In particular, "[c]ourts should be ... reluctant to second-guess agency choices involving scientific disputes that are in the agency's province of expertise." *Id.* When faced with "a purely factual question within the area of competence of an administrative agency created by Congress, and when resolution of that question depends on 'engineering and scientific' considerations, [courts] recognize the relevant agency's technical expertise and experience, and defer to its analysis unless it is without substantial basis in fact." *Id.* (quoting *Fed. Power Comm'n v. Florida Power & Light Co.,* 404 U.S. 453, 463, 92 S.Ct. 637, 30 L.Ed.2d 600 (1972)).

116. As the Sixth Circuit has noted, the federal courts have "neither the time nor the expertise" to conduct a *de novo* review of the scientific evidence supporting (or opposing) the selection of a particular response action. *United States v. Akzo Coatings of Am., Inc.,* 949 F.2d 1409, 1424 (6th Cir.1991). Rather, the court's role, "as the CERCLA statute makes clear, is one of review of the administrative record, searching for errors of procedure and for glaring omissions or mistakes which indicate that the EPA has acted arbitrarily and capriciously." *Id.; see also Burlington,* 200 F.3d at 689 ("[W]e 'give deference to the EPA's choice of response action and will not substitute our own judgment for that of the EPA.'"); *Hardage,* 982 F.2d at 1442 ("We adopt the arbitrary and capricious standard of review 'because determining the appropriate removal and remedial action involves specialized knowledge and expertise, [and therefore] the choice of a particular cleanup method is a matter within the discretion of the EPA.'") (alteration in original) (quoting *Northeastern Pharm.,* 810 F.2d at 748); *Green,* 2004 WL 1375555, at *8 (citing *Hardage,* 982 F.2d at 1442).

117. In addition, with respect to orders issued under CERCLA § 106, "Congress' emphasis on the protection of health and the environment, and especially its approval of the use of nondefinitive data in risk assessment, means that if an error is to be made in applying the endangerment standard, the error must be made in favor of protecting public health, welfare and the environment." *Conservation Chem.,* 619 F.Supp. at 194; *see also Honeywell,* 263 F.Supp.2d at 837 ("In applying the 'imminent and substantial endangerment' standard, courts should err in favor of protecting human health or the environment.").

118. In the present case, the EPA identified a pathway through which human beings could be exposed to contaminants related to Necco Park. In the agency's view, this exposure pathway, if realized, would present an imminent and substantial endangerment to the health of those individuals. The Risk Assessment determined that the risk of acquiring cancer through contact with the contaminated groundwater is significantly greater than the agency's maximum acceptable carcinogenic

risk. (Exhibit 1, Vol. VII, at p. 303091). In addition, contact with contaminated groundwater unacceptably and significantly increased the risk of non-carcinogenic health effects, such as nervous system disorders. (Exhibit 1, Vol. VII, at p. 303091).

119. The exposure pathway identified by the EPA involves, *inter alia*, the installation of a private drinking water well in one of the areas affected by Necco Park contamination. Defendant has offered a compelling argument that the installation of such a well is unlikely. However, the question is not whether the release of hazardous substances from Necco Park is *likely* to endanger human health. Rather, the issue is whether the release of hazardous substances from Necco Park *may* pose a risk to human health. *See* 42 U.S.C. § 9606(a) (providing that the EPA may issue a UAO if it determines that release "*may* be an imminent and substantial endangerment to the public health or welfare or the environment") (emphasis added); *see also Conservation Chem.*, 619 F.Supp. at 193 (noting that "if 'the public health or welfare or the environment' *may* be exposed to a *risk* of harm, an endangerment may exist.") (emphasis added); *Honeywell*, 263 F.Supp.2d at 836 (concluding that "[i]t is enough to show that such an endangerment *may* exist") (emphasis original); *Valentine*, 856 F.Supp. at 626 (holding that "[i]t is sufficient to demonstrate that there *may* be 'an imminent and substantial endangerment' ") (emphasis original).

120. In *Dague v. City of Burlington*, the Second Circuit considered an analogous provision of RCRA. In that case, the court found it significant that Congress "used the word 'may' to preface the standard of liability: 'present an imminent and substantial endangerment to health or the environment.' " *Dague*, 935 F.2d at 1355. The court noted that "[t]his is 'expansive language', which is 'intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate *any risk* posed by toxic wastes.' " *Id.* (emphasis added).

121. This Court finds that the EPA satisfied this standard. The agency determined that Necco Park was a continuing source of contamination to the surrounding groundwater, that the contamination posed a significant level of risk, and that the groundwater might be used as a source of drinking water. Based upon these facts, the agency concluded that the release of hazardous substances from Necco Park *may* present an imminent and substantial endangerment to human health. In other words, the EPA found that someone *might* be exposed to groundwater contaminated by hazardous substances from Necco Park, which *would* present an imminent and substantial endangerment to their health. This determination justified the issuance of a UAO pursuant to CERCLA § 106. *See Conservation Chem.*, 619 F.Supp. at 195 ("Because hazardous substances are, by definition, capable of causing serious harm, a substantial endangerment may exist whenever the circumstances of a release ... are such that ... members of the public *may* be exposed to such substances and are therefore put at risk.") (emphasis added).

122. The EPA's determination that a private drinking well might be installed in an area affected by Necco Park contamination was not arbitrary and capricious. First, the agency noted that the groundwater in the area has been used for domestic purposes in the past. (Exhibit 1, Vol. XVII, at p. 500178). Second, the EPA recognized that New York State classifies the groundwater as a potential drinking water source. (Exhibit 1, Vol. XVII, at p. 500177). Indeed, it is classified as "Class GA Fresh Groundwater." (Exhibit 1, Vol. XVII, at p. 500177). New York regula-

tions provide that the "best usage of Class GA waters is as a source of potable water supply." N.Y. COMP.CODES R. & REGS. tit. 6 § 701.15 (2004). The EPA's consideration of the state groundwater classification was consistent with both agency policy and the NCP. (Exhibit 1, Vol. XVII, at p. 500177).

Third, the EPA addressed Defendant's contention that the groundwater is unlikely to be used as drinking water because of its poor quality. The agency found that argument unpersuasive, noting that the groundwater served as a drinking water supply in the past and that groundwater with similar qualities is currently used in other areas as drinking water. (Exhibit 1, Vol. XVII, at pp. 500177–179). Fourth, the EPA's decision to issue the UAO was consistent with the NCP, which provides that the agency should strive to "return usable ground waters to their beneficial uses wherever practicable." 40 C.F.R. § 300.430(a)(1)(iii)(F).

In sum, the EPA carefully considered the argument raised by Defendant (*i.e.* the argument that no one is likely to install a drinking water well) and articulated a reasoned explanation for rejecting it. Defendant has not established that the agency's action in this regard was arbitrary and capricious.

123. In addition, it was not arbitrary or capricious for the EPA to consider the potential dangers that might arise if Defendant elected to (or was otherwise forced to) discontinue the response measures already in place at Necco Park. Until the agency issued the UAO in September 1998, Defendant was under no legal obligation to maintain the response measures that it had voluntarily installed and operated at Necco Park.

Furthermore, the EPA *did* consider the existing response measures and concluded that they did not adequately address the potential danger to human health created by the continued contamination of the groundwater. (Exhibit 1, Vol. XVII, at pp. 500160–167, 500175–176, 500179–180). Indeed, one of the alternative remedies considered, analyzed, and rejected by the EPA was the continuation of present response measures at the Site. (Exhibit 1, Vol. XVII, at p. 500038). This fatally undermines Defendant's argument that the agency failed to consider the actual facts and circumstances present at the Necco Park Site.

124. Defendant also suggests that the EPA failed to properly evaluate the probability that a hypothetical future domestic well would collect water containing only Necco Park-related contaminants. However, the Risk Assessment was based upon mathematical modeling that projected the transport of contamination from the Source Area to the Far Field. This Court must defer to the agency's scientific analysis with respect to this question because Defendant has not shown that it lacks a "substantial basis in fact." *Browning–Ferris,* 899 F.2d at 160.

125. In addition, this Court finds that Defendant's reliance upon the Ninth Circuit's decision in *Price* is misplaced. The facts of that case are distinguishable from those presented here. First, *Price* involved a private party action. 39 F.3d at 1012. The Ninth Circuit did not evaluate the homeowner plaintiff's claim under the "arbitrary and capricious" standard of review. *See id.* at 1018–21. Second, the hazardous substances at issue in *Price* had already been contained and controlled. Indeed, the court noted that the plaintiff had "failed to show that there [was] a hazardous level of contamination under her foundation." *Id.* at 1021. Further, "[t]esting of the soil found in the cracks of the foundation tested negative for contaminants." *Id.* In contrast, hazardous sub-

stances continue to migrate from Necco Park, contaminating the groundwater. The EPA has determined that a potential exposure pathway exists, creating an imminent and substantial endangerment that can only be addressed if the contamination is contained. Defendant failed to establish that this determination was arbitrary and capricious.

126. With respect to Defendant's second argument, this Court finds that the EPA's decision to use a baseline risk assessment was not arbitrary and capricious. The use of a such an assessment was not inconsistent with the NCP. Indeed, the lead agency is specifically required to conduct such a study under the NCP. 40 C.F.R. § 300.430(d)(4) ("[T]he lead agency shall conduct a site-specific baseline risk assessment to characterize the current and *potential* threats to human health and the environment that *may* be posed by contaminants migrating to ground water or surface water, releasing to air, leaching through soil, remaining in the soil, and bioaccumulating in the food chain. The results of the baseline risk assessment will help establish acceptable exposure levels for use in developing remedial alternatives . . . .") (emphasis added); *see also Burlington*, 200 F.3d at 689–90 (holding that use of baseline risk assessment was not inconsistent with NCP). The EPA's consideration of a baseline risk assessment was also in accordance with applicable agency guidelines. (Exhibit 1, Vol. VII, at p. 302957).

127. Finally, this Court notes that the Administrative Record also indicates that the EPA's decision was supported by evidence that contamination from the Necco Park was having a negative impact on the environment. The EPA believes that contamination from Necco Park and other sources is impacting the Niagara River and Lake Ontario, contributing to an overall risk to the environment. (Exhibit 1, Vol. XVII, at pp. 500053, 500148, 500175–176, 500188). While the Risk Assessment found that no significant ecological risk existed from the Necco Park Site alone, it did determine that two contaminants associated with the site have the potential to bioconcentrate in fish and have been found in fish tissue samples. (Exhibit 1, Vol. VII, at p. 303084; Exhibit 1, Vol. XVII, at p. 500187). In addition, the agency found that the presence of contaminants in the area where the Falls Street Tunnel discharges into the Niagara River exceeded the "total mean chronic risk index," which could pose a risk to plant and animal life. (Exhibit 1, Vol. VII, at p. 303083; Exhibit 1, Vol. XVII, at p. 500159). This potential endangerment to the environment, standing alone, could have justified the issuance of the UAO. *See* 42 U.S.C. § 9606(a) (providing that the EPA may issue a UAO if there may be an endangerment to "the public health *or* welfare *or* the environment") (emphasis added); *see also Conservation Chem.*, 619 F.Supp. at 192 (holding that CERCLA's "[u]se of the disjunctive 'or' mandates the conclusion that ... a possible endangerment to the environment alone, will warrant relief").

128. For the foregoing reasons, this Court finds that Defendant failed to establish that the EPA's decision to issue the UAO was arbitrary and capricious, or otherwise contrary to law. Defendant has not shown that the EPA "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Alcan Aluminum*, 97 F.Supp.2d. at 272 (quoting *Burlington*, 200 F.3d at 689). As such, the agency's decision to issue the UAO must be upheld.

## V. Recovery of Costs Related to September 1998 UAO

129. Plaintiff also seeks to recover response costs incurred by the EPA in connection with its oversight of Defendant's implementation of the remedy, as directed under the UAO. In addition, Plaintiff claims that it is entitled to a declaratory judgment for all future response costs, including the costs of overseeing Defendant's implementation of the selected remedy.

130. Defendant argues that the EPA's oversight costs are not recoverable under CERCLA § 107. Specifically, Defendant contends that governmental oversight of a private party cleanup is not a "response action," as that term is defined under CERCLA. Therefore, costs associated with such oversight cannot be recovered from a responsible party under § 107.

131. This Court finds that the EPA's oversight costs are recoverable under CERCLA § 107.

132. This issue was previously addressed in this Court's Decision and Order resolving the parties' summary judgment motions. In that decision, this Court held that costs incurred in connection with governmental oversight of a private party cleanup are recoverable under CERCLA § 107. (Docket No. 52, at pp. 8–16). The relevant portion of that decision, which is hereby incorporated by reference, may be summarized as follows.

133. First, there is controlling precedent that resolves this issue. In *New York v. Shore Realty Corp.*, the Second Circuit held that the State of New York was entitled to recover its oversight costs pursuant to CERCLA § 107(a). In particular, the court found that "[t]he State's costs in assessing the conditions of the site and supervising the removal of the drums of hazardous waste squarely fall within CERCLA's definition of response costs, even though the State is not undertaking to do the removal." *Shore Realty,* 759 F.2d at 1042–43; *see also Town of New Windsor v. Tesa Tuck, Inc.,* 935 F.Supp. 317, 324–27 (S.D.N.Y.1996) (citing *Shore Realty* and concluding that governmental "oversight costs fall squarely within the statutory definitions of 'removal' and 'remedial' ").

134. Second, the plain language of CERCLA allows for the recovery of governmental oversight costs. CERCLA's definition of "removal" includes: "such actions as may be necessary to *monitor,* assess, and evaluate the release or threat of release of hazardous substances." 42 U.S.C. § 9601(23) (emphasis added).

As other courts have noted, the term " 'monitor' is generally synonymous with audit, check, control, inspect, investigate, observe, oversee, regulate, review, scrutinize, study, test, survey, and watch." *United States v. Lowe,* 118 F.3d 399, 403 (5th Cir.1997) (quoting *Atl. Richfield v. Am. Airlines, Inc.,* 98 F.3d 564, 569 (10th Cir.1996)). In the context of a CERCLA cost-recovery action, "monitoring" includes governmental oversight, *i.e.* actions necessary to oversee, observe, investigate, study, or scrutinize the release or threatened release of hazardous substances in an effort to determine the appropriate course of action. *See Lowe,* 118 F.3d at 403; *Atl. Richfield,* 98 F.3d at 569; *see also United States v. Chromalloy Am. Corp.,* 158 F.3d 345, 349 (5th Cir.1998) ("The government's oversight costs in a responsible party clean-up are response costs under CERCLA.").

In addition, CERCLA's definition of "response" includes "removal" and "enforcement activities related thereto." 42 U.S.C. § 9601(25). As the Fifth Circuit noted, "EPA oversight of removal and remedial actions that are conducted by responsible

parties easily falls within this definition of response." *Lowe,* 118 F.3d at 403. "Government monitoring or oversight is an inherent and necessary enforcement element of private party response action." *Id.* This is because "the EPA must evaluate all stages of the cleanup process, from the preliminary investigation through the final disposition of hazardous substances at a site." *Id.; cf. also Atl. Richfield,* 98 F.3d at 570 (concluding that "monitoring or oversight of a private party remedial action to determine whether the action complies with a consent decree and the provisions of CERCLA is enforcement activity related to a remedial action").

135. Third, Defendant's narrow interpretation of CERCLA § 107 would frustrate the statute's remedial purpose. The Second Circuit has held that interpretation of CERCLA's terms must be "guided by [the statute's] few well-established principles." *Commander Oil,* 215 F.3d at 327. "Because it is a remedial statute, CERCLA must be construed liberally to effectuate its two primary goals: (1) enabling the EPA to respond efficiently and expeditiously to toxic spills, and (2) holding those parties ... responsible for the releases liable for the costs of the cleanup." *Id.* (quoting *B.F. Goodrich v. Murtha,* 958 F.2d 1192, 1198 (2d Cir.1992)); *see generally Freier v. Westinghouse Elec. Corp.,* 303 F.3d 176, 202 (2d Cir.2002) ("[I]t is recognized that ... 'the two ... main purposes of CERCLA are prompt cleanup of hazardous waste sites and imposition of all cleanup costs on the responsible party ....' ") (citations omitted). "The scheme envisioned by Congress protects taxpayers generally from bearing the costs of nationwide cleanup." *Commander Oil,* 215 F.3d at 327. "Instead, potentially responsible parties must shoulder the frequently heavy burden of environmental liability." *Id.*

136. In sum, this Court finds that the EPA's oversight costs related to Defendant's performance under the UAO are recoverable response costs under CERCLA § 107.

## VI. Declaratory Judgment and Prejudgment Interest

137. Plaintiff is entitled to a declaratory judgment for all costs of future response actions at the Necco Park Site not inconsistent with the NCP. *See* 42 U.S.C. § 9613(g)(2). ("In any such action described in this subsection, the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."); *see also Goodrich,* 311 F.3d at 175; *Alcan Aluminum,* 755 F.Supp. at 543.

138. The parties have agreed that Plaintiff is entitled to an award of prejudgment interest. (Docket No. 89, at ¶ 7). Prejudgment interest shall be accrued from the date of demand or the date of expenditure of the amount concerned, whichever is later, on the amount of all costs awarded against Defendant in this action. *See* 42 U.S.C. § 9607(a); *see also Alcan Aluminum,* 755 F.Supp. at 543.

## SUMMARY

139. The EPA's use of the RCRA Order and Consent Decree to respond to the release of hazardous substances at the Necco Park Site was not inconsistent with the NCP. Plaintiff is therefore entitled to recover costs associated with the EPA's oversight of Defendant's performance under the RCRA Order and Consent Decree.

140. Plaintiff's claim for DOJ enforcement costs is not subject to a "necessary" or "reasonableness" standard. Further, Plaintiff adequately documented those costs, as required under the NCP. As such,

Plaintiff is entitled to recover the DOJ's enforcement costs incurred in connection with litigation involving the Necco Park Site.

141. The EPA's decision to issue a UAO in September 1998 was not arbitrary and capricious. In addition, the agency's oversight costs related to that UAO are recoverable from Defendant under CERCLA § 107.

142. Plaintiff is entitled to recover a total of $1,583,445.00 from Defendant for past response costs incurred by the EPA in connection with the Necco Park Site.

143. Plaintiff is entitled to recover a total of $225,133.42 from Defendant for enforcement costs incurred by the DOJ in connection with the Necco Park Site.

144. Plaintiff is entitled to a declaratory judgment for all costs of future response actions at the Necco Park Site not inconsistent with the NCP.

145. Plaintiff is entitled to an award of prejudgment interest.

## ORDERS

IT HEREBY IS ORDERED that the Clerk of the Court shall enter a Judgment consistent with this Decision and Order pursuant to Rules 52(a) and 58 of the Federal Rules of Civil Procedure.

SO ORDERED.

**LIST OF ACRONYMS**

| | |
|---|---|
| AOC | Administrative Order on Consent |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| DNAPL | Dense Non–Aqueous Phase Liquid |
| DOJ | United States Department of Justice |
| EPA | Environmental Protection Agency |
| NCP | National Contingency Plan |
| NFRAP | No Further Remedial Action Planned |
| NPIPL | Necco Park Indicator Parameter List |
| NPL | National Priorities List |
| NYDEC | New York State Department of Environmental Conservation |
| NYPA | New York Power Authority |
| PRPs | Potentially Responsible Parties |
| RCRA | Resource Conservation and Recovery Act |
| RI/FS | Remedial Investigation/Feasability Study |
| ROD | Record of Decision |

| | |
|---|---|
| UAO | Unilateral Administrative Order |